Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Maria Gorecki (mgorecki@kasowitz.com)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700
Fax:   (212) 506-1800

Attorneys for Plaintiffs Source Interlink Distribution L.L.C.
 and Source Interlink Companies, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

SOURCE INTERLINK DISTRIBUTION, L.L.C. and
SOURCE INTERLINK COMPANIES, INC.,

               Plaintiffs,

       - against -

AMERICAN MEDIA, INC., BAUER PUBLISHING CO.,
LP., CURTIS CIRCULATION COMPANY,
DISTRIBUTION SERVICES, INC., HACHETTE
FILIPACCHI MEDIA, U.S., HUDSON NEWS
COMPANY, KABLE DISTRIBUTION SERVICES, INC.,
THE NEWS GROUP, LP, TIME INC. and
TIME/WARNER RETAIL SALES & MARKETING,
INC.,

              Defendants.

-------------------------------------------------------------------- x

09 CIV. 1152   (PAC)(MHD)

JURY TRIAL DEMANDED

## VERIFIED COMPLAINT

Plaintiffs Source Interlink Distribution L.L.C. ("Source") and Source Interlink Companies, Inc. ("Source Interlink"), for their verified complaint against defendants Time Inc. ("Time"), Bauer Publishing Co., L.P. ("Bauer"), American Media, Inc. ("AMI"), Hachette Filipacchi Media, U.S. ("Hachette"), Time/Warner Retail Sales & Marketing Inc. ("TWR"), Curtis Circulation Company ("Curtis"), Kable Distribution Services, Inc. ("Kable"), Distribution Services, Inc. ("DSI"), Hudson News Company ("Hudson") and The News Group, L.P. ("News Group"), upon knowledge as to themselves and otherwise upon information and belief, allege as follows:

## Preliminary Statement

1.     In this action, Source, a wholesaler of magazines to leading mass-merchandise retailers, bookstore chains, grocery stores and other retail outlets, and its parent, Source Interlink, seek a temporary restraining order and a preliminary and permanent injunction, among other relief, to enjoin defendants from continuing their collusive anti-competitive scheme -- in clear violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and common law -- to attack, disparage and destroy Source's business.

2.     Emergency relief is necessary to prevent the imminent irreparable harm -- the destruction of Source's business and the monopolization of the United States wholesale magazine distribution market -- that the misconduct of defendants, major magazine publishers, their distributors, and two of the only four major wholesalers in the United States, will, if not restrained, doubtless cause.

3.     As described below, defendants, in furtherance of their scheme, have:  cut Source off from *People*, *Sports Illustrated*, *Entertainment Weekly*, *Time* and other major magazines;

spread disparaging rumors about Source and its financial condition to its customers, employees and others in the industry; encouraged Source's customers to cease doing business with it through, among other things, such false rumors; sought to coerce Source into selling its distribution facilities to defendants at fire sale prices; and raided Source's employees and sought to steal the intellectual property that those employees used to run its business.

4.     If defendants' schemes are not stopped, Source's entire business, including its good will, reputation, 8,000-employee work force and customer base, will be destroyed. Indeed, defendants already have succeeded in destroying Anderson, the only other non-colluding wholesaler in the market, by also recently cutting it off from all supplies of the publishers' magazines.  Anderson announced on February 7, 2009 that it had no recourse but to cease normal business activities effective immediately.

5.     Defendants' indisputable goal is to destroy Source's business so that defendants -- through Hudson and News Group, the two remaining wholesalers -- will monopolize the wholesale market and use that monopoly power to shift to retailers and consumers -- and away from publishers -- the entire financial burden resulting from worsening market conditions and publisher-induced inefficiencies in the distribution system.

6.     Absent intervention by this Court enjoining defendants from continuing to engage in their collusive anti-competitive and tortious conduct, the harm both to competition in this market and to Source's distribution business, goodwill, reputation and customer base will be irreparable.

### THE PARTIES

**A.**   **Publishers**

7.     Defendant Time, a Delaware corporation with its principal place of business in New York, New York, the parent corporation of defendant TWR, is the largest magazine publisher. in the United States and publishes more than 120 magazines, including *Time*, *People*, *Entertainment Weekly*, *Sports Illustrated*, *Essence*, *Fortune*, *Gold*, *In Style*, *Money*, *People en Espanol*, *Real Simple*, *Sports Illustrated for Kids*, *This Old House*, *Coastal Living*, *Cooking Light*, *Health*, *Southern Accents*, *Business 2.0*, and *Southern Living*.

8.     Defendant AMI, a Delaware corporation with its principal place of business in Boca Raton, Florida, is the fourth largest consumer magazine publisher, and the second largest publisher in retail magazine sales, in the United States.  It publishes 16 titles, including 6 of the top 15 best selling weekly newsstand magazines.  Its publications include *Country Weekly*, *FLEX*, *GLOBE*, *Men's Fitness*, *MUSCLE & FITNESS*, *National Enquirer*, *SHAPE*, and *Star*.

9.     Defendant Bauer, a Delaware partnership with its principal place of business in Englewood Cliffs, New Jersey, is the largest publisher of newsstand magazines in the United States.  It publishes magazines such as *In Touch Weekly*, *Life & Style Weekly*, *Woman's World*, *First For Women* and *Soaps In Depth*.

10.     Defendant Hachette, a Delaware corporation with its principal place of business in New York, New York, is the publisher of *Car and Driver*, *Road & Track*, *ELLE*, *ELLEGirl*, *ELLE Décor*, *HOME*, *Metropolitan Home*, *Woman's Day*, *American Photo*, *Boating*, *Cycle World*, *Popular Photography* and *Sound & Vision*.

**B.**    **National Distributors**

11.    National magazine distributors are retained by magazine publishers to broker and manage their relationships with their wholesalers.

12.    Defendant TWR, a New York corporation with its principal place of business in Parsippany, New Jersey, and an office in New York, New York, is a national magazine distributor, whose publishing clients include its affiliate defendant publisher Time.

13.    Defendant Curtis, a Delaware corporation with its principal place of business in Pennsauken, New Jersey, is a national magazine distributor, whose clients include defendant publishers AMI and Curtis's affiliate Hachette.

14.    Defendant Kable, a Delaware corporation with its executive offices in New York, New York, is a national magazine distributor, whose clients include defendant publisher Bauer.

15.    Defendant DSI, a Delaware corporation with its principal place of business in Delray Beach, Florida, is a subsidiary of defendant AMI and a provider of marketing services to publishers, including AMI, Bauer and Hachette.

**C.**    **Magazine Wholesalers**

16.    There are three major wholesalers, now that Anderson has been driven out of business, who sell to retail outlets magazines for single-copy sales at such outlets.

17.    Plaintiff Source, a Delaware corporation with its principal place of business in Bonita Springs, Florida, is a major magazine wholesaler, and is the leading wholesaler in five of the nation's top ten advertising markets.  Plaintiff Source Interlink is Source's parent company.

18.   Defendant Hudson, a New Jersey corporation with its principal place of business in North Bergen, New Jersey, is a major magazine wholesaler.

19.   Defendant The News Group, L.P. ("News Group"), a Delaware limited partnership with its principal place of business in Texas, is a major magazine wholesaler.

## JURISDICTION AND VENUE

20.   This action is brought to obtain injunctive relief and to recover damages caused by defendants' violation of, among other things, Section 1 of the Sherman Act, 15 U.S.C. § 1.

21.   The Court has subject matter jurisdiction over this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; 28 U.S.C. § 1337, and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

22.   Venue is proper in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, inasmuch as defendants transact business and are found within this district, and a substantial part of the events giving rise to plaintiffs' claims occurred within this district.

## BACKGROUND

### A.    Overview:  Single-Copy Magazine Sales

23.   The major United States magazine publishers, which publish the magazines and set their cover prices, include defendants Time, AMI, Bauer, and Hachette.  To effectuate single-copy magazine sales (*i.e.*, non-subscription sales), each publisher retains a national distributor, which serves as a broker to manage the publisher's relationship with its

wholesalers, provides marketing and accounting services to the publisher and guarantees the wholesaler's payment obligations to the publisher.

24.     The four U.S. national distributors are defendants TWR, Kable and Curtis, as well as Comag Marketing Group LLC ("CMG").  The national distributors are compensated with a percentage, typically two to five percent of the retail sales value of the magazines they handle. Defendant DSI, a subsidiary of AMI, provides sales and marketing services to publishers.

25.     Pursuant to allotment orders provided by the national distributors (which typically greatly exceed the number ultimately purchased by consumers), the publishers' magazines are shipped to wholesalers, who in turn, ship the magazines to retailers, including traditional mass merchandisers and grocery store chains, such as Wal-Mart and Kroger, as well as newsstands, convenience stores, airport terminals and other retail outlets, and specialty retailers like Barnes & Noble and Borders.

26.     Wholesalers are responsible for picking up, tabulating and destroying copies of magazines that remain unsold.  Wholesalers buy the magazines from the publishers at a price of 50 to 60 percent of the cover price and sell to the retailers at a price of 70 to 75 percent of the cover price.  Before defendants' conspiracy drove Anderson out of business, the market shares of the four wholesalers broke down as follows:  Source 41%, Anderson 27%, Hudson 11% and News Group 21%.

### B.     Inefficiencies in Traditional Distribution System

27.     The distribution system is plagued by gross publisher-induced inefficiencies that have imposed onerous and unnecessary costs on wholesalers.  For example, publishers and national distributors customarily ship to wholesalers quantities of magazines that far exceed the

number of magazines sold by the retailers. Wholesalers are forced to absorb the full cost of tabulating the unsold copies and transporting them back to their own facilities for disposal or destruction.

28.    A different system for distribution has been proposed, under which the retailers automatically would report sales of magazines through electronic checkout scanners and then dispose of unsold copies.

29.    The publishers, however, adamantly oppose the proposed system, because they supposedly would not be paid for, nor would their circulation numbers reflect, "shrinkage" -- *i.e.*, sales that are not scanned as a result of machine error, estimated to be approximately five percent of all sales.

30.    In addition to shipping excessive magazine copies, publishers and national distributors ship large numbers of unprofitable magazine titles, forcing the wholesaler to bear unnecessary costs of handling and returns. Publishers and national distributors likewise have resisted efforts to curtail their ability to ship unprofitable titles.

C.    <u>**Source and Its Efforts to Remain Competitive**</u>

31.    Source Interlink, which was founded in 1995 and has approximately 8,000 employees, commenced its business, which it conducts through Source, as a magazine wholesaler in 2001. In the traditional market, Source's operations are focused in 25 states

throughout the West Coast, the mid-Atlantic and the mid-western Rust Belt.  Source has been engaged in business with defendants since 2001.[1]

32.   During the past five years, Source has invested heavily in distribution equipment, wholesaling centers, technology, logistics and software.  The company also has sought to address with publishers and national distributors the unnecessary and burdensome costs caused by excessive supply and unprofitable titles.

33.   On or about January 14 of this year, one of Source's wholesaler competitors, Anderson, announced that it would impose an additional $.07 per copy distribution fee for all magazine copies received, and would pass on to the publishers the carrying costs of inventory in retail chains where it had negotiated scan-based trading terms.  Before that announcement, Source had been conducting a title-by-title profitability study.  After Anderson issued its surcharge announcement, Source decided to issue an announcement stating that Source would impose a similar per copy distribution fee because this was an expeditious way to begin to address the cost challenges in this business.  Source expected to continue to work with the publishers and national distributors to address fully the cost issues.  Accordingly, Source announced a $.07 surcharge to be effective February 1, 2009, by a letter of January 19, 2009.

34.   The publishers and national distributors resisted the surcharge.  As a result, shortly after Source's January 19th announcement, Source rescinded the surcharge, and all the publishers and national distributors (except one) told Source that they would continue to supply

---

[1]   Source Interlink is also a publisher of popular magazines.  In 2007, Source Interlink acquired more than 75 consumer magazines, 90 related Web sites, more than 65 events, television and radio programs, and approximately 400 branded products from Primedia Inc.  The new company, known as Source Interlink Media, made Source Interlink a leading special-interest magazine publisher in the United States, with well-known brands such as *Motor Trend, Automobile, Snowboarder* and *Soap Opera Digest*.

Source with magazines and discuss with Source alternative approaches for addressing the disproportionate cost burden imposed by excessive supply and unprofitable titles.

35.    Thus, during the week of January 26, 2009, Alan Tuchman, Source's President, and Chris Argentieri, Source's Senior Vice President, traveled to New York to meet with the major publishers and national distributors.  On January 27, Tuchman and Argentieri met with Curtis's President and Chief Operating Officer Bob Castardi.  Castardi stated that he would suggest an alternative approach for addressing the profitability issues within the following week, that any agreement would be retroactive to February 1, 2009, and that Curtis would continue to ship magazines to Source.

36.    On January 27, Tuchman and Argentieri also met with Bauer's President and Chief Executive Officer, Hubert Boehle, its Senior Vice President, Rick Parker, and Executive Vice President Henning Lauer.  Bauer offered to discuss other possibly mutually-beneficial changes, such as helping to fund an expansion into Anderson territory and granting Source exclusivity in stores.

37.    On January 28, Tuchman confirmed to Parker that Source had rescinded the $.07 surcharge, and Parker confirmed that Bauer would grant Source exclusivity in certain retail outlets.

38.    On January 29, Source's Chief Executive Officer, Gregory Mays, spoke with defendant publisher AMI's President, David Pecker.  Pecker told Mays that AMI did not have any business or credit issues with Source and assured Mays that AMI would continue to ship magazines to Source.

39.    On January 30, Mays confirmed to Pecker during a conference call that the $.07 surcharge was not applicable to AMI.  Pecker stated that, if Curtis was on board -- which it had claimed to be -- AMI would continue to ship magazines to Source, and the parties would discuss the economics later.  Curtis and Pecker stated that they would ensure that Bauer (which, notwithstanding the January 28 Tuchman-Parker conversation, had sent a January 30 termination notice) also would continue to supply magazines to Source.

40.    On January 30, during a Mays discussion with Curtis's Castardi and AMI's Pecker, Castardi agreed that Source was "within terms" and that Curtis had no business or accounting issue with Source.  Having heard that AMI would continue to ship magazines to Source and that AMI had no issues with Source, Castardi expressly stated that Curtis -- "of course" -- would continue to ship to Source.

41.    On January 31, 2008, Mays had a very productive and cordial three-hour meeting with Rich Jacobsen, TWR's CEO, at his office, where Mays confirmed that the $.07 surcharge was rescinded and that Source wanted to continue a positive relationship with TWR.  Jacobsen responded that the "door was still open" and that TWR had not entered into any agreements with other wholesalers.  As a demonstration of Source's good faith, Mays agreed that Source would accelerate payments on Monday, February 2, 2009, of amounts not yet due.  Jacobsen stated that he appreciated that gesture and he and Mays arranged to meet in New York for dinner on Monday, February 2, 2009, to discuss further continuing the relationship.  Mays believed it was a very positive meeting.

**D.     The Conspiracy to Destroy Source and Steal Source's Business**

42.    Despite the clear assurances to the contrary, the publisher and distributor defendants, moving in virtual lockstep, abruptly and to Mays's shock, cut Source off from its supply of magazines -- including the most popular titles, like *People* and *Sports Illustrated*.  At the same time, the defendants launched a campaign in which certain of them spread false rumors to Source's customers and others that Source was in deep financial trouble and had ceased operations or was exiting the magazine wholesale business.  The goal of that coordinated campaign was to do just that -- to put Source out of business.  At the same time that all the defendants had cut Source off and defendants were spreading those lies, defendants were seeking to acquire Source's distribution facilities and defendants were stealing Source's employees and the proprietary intellectual property that those employees had used to run Source's business.  Simply stated, defendants have been destroying Source, and they are only a day or two away from succeeding unless the interim relief plaintiffs seek is granted.

43.    Thus, for example, on January 27, 2009, TWR refused to supply Source with any Time publications -- 20% of Source's business.  TWR also launched a disinformation campaign of false statements concerning Source's financial condition and alleged liquidity problems.  And even though Source was essentially current in its obligations to TWR, TWR disseminated an e-mail to all of TWR's publishers stating that TWR no longer would continue to provide the traditional national distributor guarantee, common in the industry, of Source's payment for any products shipped to Source.

44.    On February 2, 2009, TWR distributed to all its "retail partners" a letter further disparaging Source, falsely stating that Source owed TWR tens of millions of dollars in

outstanding payments and for "unsubstantiated deductions." The letter also falsely stated that TWR was forced to stop delivering Time product to Source because of its alleged "ultimatum imposing" an additional fee -- the previously announced $.07 surcharge that Source already had rescinded. Rumors instigated by TWR also surfaced during this time, including the false rumors that Source was filing for bankruptcy and that it had ceased all operations.

45.    TWR, however, was not acting alone. Defendants DSI, Hachette, Hudson and Time stopped shipping magazines to Source. Defendants Curtis, Bauer and AMI, and other defendant publishers, which together constituted 60% of Source's business, also were attacking Source.

46.    Notwithstanding their assurances, on Monday, February 2, 2009, within minutes of Source's making a payment to its national distributors of more than $60 million ($25 million of which was paid to TWR), Curtis, Bauer and Kable sent letters to Source reneging on their commitment to continue supplying product to Source. TWR also immediately issued its disparaging letter to its "retail partners" on that same day. In addition, David Pecker of AMI called Mays on the afternoon of February 2 and told Mays that AMI would stop supplying product to Source. Pecker claimed that AMI had no choice because it had to follow the lead of its distributor, Curtis, who also would stop supplying product to Source. Mays also learned that -- at the same time that AMI had been representing that it would continue to supply Source, *i.e.*, on January 29, 2009, DSI -- a subsidiary of AMI -- was diverting product intended for Source to Hudson and News Group.

47.    Moreover, a Source executive was advised by the president of Curtis that, on January 31, he (Curtis) knew -- with "100% certainty" -- that TWR, Bauer and AMI would

refuse to supply product to Source.  Castardi obviously knew that if he had disclosed the truth

to Source on January 31, *i.e.*, that Curtis was acting in concert with the others and they all

intended to cut off Source's supply of magazines, Source would not have transferred more than

$20 million to Curtis on February 2.

48.   The goal of TWR and its co-conspirators was clear:  by cutting the life blood of

Source's business -- 80% of its magazine product -- Source would be eliminated as a

competitor and, more importantly, Source would be forced to sell at a "fire sale" its business

infrastructure -- including its trucking fleet, distribution equipment and distribution centers --

to its wholesale competitors,  Hudson and News Group.  Indeed, TWR and its co-conspirators

already had been negotiating with both Hudson and News Group to accomplish this part of its

scheme, which involved dividing the U.S. distribution territory into two regions -- one

controlled by Hudson and the other controlled by News Group.  Thus, on February 2, 2009,

TWR announced that it already reached agreements with other wholesale partners, and in a

separate letter, TWR stated that, effective February 1, Marketforce, a TWR-related company,

would assume responsibility for billing, sales and marketing.

49.   During Mays's planned February 2 dinner meeting in New York with Rich

Jacobsen, Jacobsen made clear why Source was being terminated.  In a total about-face from

their meeting on Saturday, Jacobsen declared that there would be no conversation about supply

because TWR would not be supplying any magazines to Source.  During that dinner, Mays

asserted to Jacobsen that with the distribution system being created by him and others, there

would be no scanning-based trading, the wholesalers would force reduced margins down to the

retailers rather than to the publishers, and there would be absolute control over the market.

Jacobsen's response was:  "Exactly -- we now control this space."

50.    Jacobsen's boastful admission to Mays is in striking contrast to his pretexts for cutting off Source's magazine supply in another false and defamatory letter that he sent to retailers several days later.  In a February 5, 2009 letter, Jacobsen said that the supply of magazines to Source was terminated because (a) Source and Anderson had "put a gun to our head" through the "sudden and simultaneous imposition of a $.07 per copy fee," and (b) Source was an "unreliable wholesaler[ ]," which failed to pay its bills.  Both statements are false.

51.    First, Jacobsen was well aware -- and his letter admits -- that Source had rescinded the $.07 fee before the date the fee was to take effect and several days before he sent the letter.  TWR, however, proceeded with the termination anyway because it was only through such termination that TWR and the other distributors and publishers would be able to, as Jacobsen had put it, "control this space."

52.    Second, contrary to Jacobsen's attempt to disparage Source as an unreliable wholesaler which did not pay its bills, Source was always current on its payment obligations to TWR, although issues arose with respect to, among other things, the amounts and timing of credits owed by TWR to Source for marketing services provided by Source.  Such issues typically arise in the ordinary course of business in this industry and are being invoked by Jacobsen now merely as a pretext for cutting off Source's supply.  Indeed, in connection with one of these disputed issues, Source made a $25 million payment to TWR on February 2, 2009, at virtually the same time Jacobsen was claiming that Source was not paying its bills and, again, several days before he sent his February 5 letter.

53.    This is truly part of an orchestrated campaign to destroy Source as part of a scheme to eliminate competition among wholesale distributors and to enable the publishers to

control this market.  Most recently, defendants have been stealing Source's employees.  On

Friday, February 6, wholesaler News Group, which evidently is acting in concert with TWR,

began raiding the key employees in Source's Wisconsin, Minnesota, South Dakota, Iowa,

Michigan and Chicago territories, and, Source believes, stealing the intellectual property used

by those employees to run Source's business.  News Group has solicited and recruited several

of Source's directors for that region and already has employed two of Source's directors, Dave

Deitrich and Jack Foerst.  For example, Deitrich appears poised to take more than 100 of

Source's other employees from that region.  News Group reportedly is attempting to exploit

Source's employees' (many of whom are single mothers) fear of unemployment through job

offers premised on the condition that the jobs be accepted immediately.

        54.    The defendants' scheme has already succeeded in enabling them to charge higher

prices.  The wholesaler defendants have already begun to serve retailers previously served by

Anderson, and, when signing agreements with those retailers, have negotiated higher rates for

"[a]bout 80%" of the new business.  In one instance, for example, TNG was able to reduce the

cover-price discounts received by retailer Kroger from 27% to 26% (in other words, Kroger

now pays 74% of the magazine cover price, whereas previously it paid 73%), made possible

solely by defendants' conspiracy.  This represents a 1.37% price increase -- 74% of the cover

price minus 73% of the cover price, divided by the rate, 73% of the cover price, equals 1.37% -

- for the exact same products Kroger was receiving through Anderson.  An e-mail, which

Source has been told by a publisher is from Curtis, describes that increase.  Source also

understands that Hudson has already imposed price increases in Pennsylvania.

E.    **Source Will Suffer Irreparable Harm**

55.    Absent intervention by this Court enjoining TWR, Curtis, Kable, Bauer, AMI, DSI, Hachette and Time to resume the supply of product to Source, the harm both to competition in this market and to Source's distribution business, good will, reputation and customers, will be irreparable.  Defendants' conduct already has caused enormous damage.  One of Source's important customers, Supervalu, for example, immediately sent a letter to Source on February 2, 2009, referring to TWR's termination letter and advising that the loss of that business "would result in material reduction of available popular titles by approximately fifty percent," that Supervalu was being placed in "an unacceptable position," and that, if Source is unable to ship that product, "Supervalu will have no choice but to seek these titles elsewhere."  Another important customer, Kroger, sent a letter to Source on February 5 stating that Kroger "has been informed that Source Interlink is currently unable to supply to Kroger" certain magazine titles and advising that Kroger is "seeking to obtain these titles from alternative sources."

56.    Defendants' attack on Source is resulting in an anti-competitive monopoly in the magazine distribution business.  In addition to Jacobsen's February 2 boast, the e-mail Source has been told is from Curtis is just another admission that the destruction of Source and Anderson will create a "monopolistic wholesaler" with the power to dominate the market.

## THE RELEVANT MARKET

57.    The relevant product market for the purposes of this action is the national market for the wholesale distribution of single-issue magazines.  The four major wholesale distributors of single issue magazines in the United States -- Source, Anderson, Hudson and News Group, sell hundreds of magazine titles to thousands of retailers across the country.  These wholesalers

17

introduce great efficiencies into the market. By purchasing from wholesalers, retailers receive an enormous savings of time and expense by allowing them to purchase from a single source with an established distribution network.

58.    To obtain these savings, retailers obtain all of their product from the wholesale network, comprised of the four wholesale distributors, and do not deal directly with publishers or national distributors. Because of the sheer number of publishers and their publications, it would be prohibitively expensive for retailers to obtain their magazines outside of the wholesale market, as it would require them to:  contact each individual publisher; negotiate prices for and order each individual publication; and physically transfer those magazines to their retail outlets -- that is, take over the functions performed by the wholesalers and national distributors. Because of these costs, retailers are unable to substitute the magazines obtained through the wholesale network with magazines obtained from some other source. As a result, retailers must continue to utilize the wholesale network even if the prices in that market rise.

59.    Because of the costs involved in developing and maintaining the distribution network necessary to transport millions of magazines to thousands of different retail outlets -- including distribution centers, freight depots, fleets of trucks, and thousands of employees -- the wholesale distribution market is characterized by high barriers to entry. These entry barriers are reinforced through the exclusive distribution agreements involving wholesalers, national distributors and publishers.

## COMPETITION HAS BEEN INJURED BY THE CONSPIRACY

60.    Defendants' actions unduly restrain, hinder and suppress competition among wholesalers in the national market for the wholesale distribution of single-copy magazines.

Defendants, directly and proximately, have caused antitrust injury because, and absent injunctive relief, their actions will result in the elimination of Source as a wholesale distributor, thereby directly and substantially reducing the output of magazines and directly and substantially reducing the ability of retailers to obtain those magazines.  Defendants' conduct also has allowed them to force retailers to pay higher prices (in the form of reduced discounts) as already has been experienced with certain of the new agreements negotiated by Hudson and News Group.  The purposeful and wrongful destruction of Source's business by defendants directly has harmed both competition in the relevant market as well as Source.

61.    Defendants' conduct has reduced the output of magazines through the wholesale market.  Source and Anderson, combined, distribute 50 percent of all U.S. single-copy magazines, and in many instances are the only wholesale distributors operating in a numerous geographic regions.  Because of defendants' unlawful boycott, wholesale distributors are unavailable to serve retailers in those areas, and those retailers have been denied access to defendants' magazines -- which means, in turn, that the retailers' customers have access to fewer magazines as well.

62.    Moreover, absent injunctive relief, Source will be forced to exit the market, and, in areas where Source has the only viable distribution operations, it will be weeks or months before magazines can be delivered to retailers in those markets, if ever.  Magazine publishers are paid based only on the number of magazines sold, not the number of magazines produced, which means that, unless magazines make it onto store shelves, publishers will not receive income on the magazines they publish.  Many smaller publishers depend on regular nationwide distribution, and some will be unable to survive a disruption in sales of even a few weeks.  Many are likely to be forced to shut down.  This will permanently reduce the choices available

to retailers and their customers, and correspondingly benefit the remaining large publishers in the marketplace -- including defendants AMI, Bauer, Hachette and Time.

63.     Defendants already have begun charging retailers higher prices for the same products, and, if defendants succeed in forcing Source to exit the market, defendants will continue to raise the prices paid by retailers.  For example, as a result of the defendants' boycott, News Group has begun to distribute to retailers previously served by Anderson.  As it has done so, it has been "re-signing" those retailers at a higher rate than what they paid Anderson, forcing the retailers to pay a higher portion of each magazine's cover price.  News Group's ability to charge these higher prices is not the result of any inherent or earned competitive advantage, but has instead arisen solely as a result of the increased market power it has obtained by participating in the collusive boycott of Source and Anderson.

64.     Indeed, News Group and Hudson stand to acquire monopolistic market power. Once defendants' conspiracy to destroy the wholesale business of Source succeeds, a virtual certainty absent injunctive relief, News Group and Hudson together will control more than 90% of the U.S. wholesale magazine distribution market and, more importantly, each will control more than 90% of the market in its allocated territories.  In light of defendants' anti-competitive conduct in obtaining this market power, there are substantial grounds to believe that defendants' acquisition of market power will harm competition market-wide.

## FIRST CLAIM

### (Unlawful Restraint of Trade -- Sherman Act)

65.     Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

66.    Defendants have engaged in a conspiracy in unreasonable restraint of trade in violation of section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15).

67.    Defendants engaged in a conspiracy to eliminate competition in the wholesale market for single-issue magazines through the wrongful destruction of competitors Source and Anderson as going concerns, and the defendants did those things that they combined and conspired to do, including the following:

(a)    agreed to boycott the distribution of single-issue magazines to wholesalers Source and Anderson with the intent of destroying them as competitors;

(b)    agreed to, and did in fact, disparage Source's business to its retail customers for the purpose of interfering with Source's business relationships and contractual agreements with those customers with the intent of forcing Source's customers to move their business to defendants Hudson and News Group;

(c)    agreed to raid, and, in fact, did raid the employees of Source and Anderson for the purpose of stealing their trade secrets and eliminating them as competitors; and

(d)    agreed to destroy Source and Anderson as going concerns and to force those wholesalers to sell their distribution facilities and other assets -- at distressed prices -- to defendants Hudson and News Group.

68.    The ongoing conspiracy has the effect of restraining trade by suppressing and eliminating competition in the U.S. market for the wholesale distribution of single-issue magazines.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs have suffered, and will continue to suffer, injury to their business.

69.    The continuation of defendants' unlawful conduct will have the immediate effect of destroying plaintiffs' ability to continue as going concerns, and defendants' unlawful conduct will continue unless permanently enjoined by this Court.

70.    Plaintiffs have no adequate remedy at law.

## SECOND CLAIM

### (Defamation)

71.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

72.    Defendants, individually and in conspiracy with each other, have published false statements to third parties about Source's financial status and continued existence as a magazine wholesaler.

73.    Defendants have falsely and deceitfully, both orally and in writing, told third parties false statements regarding Source's financial status and continued existence as a magazine wholesaler.

74.    The false and defamatory statements made by the defendants are injurious to the business reputation of Source and will tend to prejudice it in the conduct of its trade or business and will deter third persons from dealing with it.

75.    The false and defamatory statements made by the defendants have caused damages to plaintiffs in that the false statements have caused damage to the reputation of Source in its trade and business activities.

## THIRD CLAIM

### (Tortious Interference)

76.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

22

77.   Source maintains significant business relationships with the retail customers that are a part of its national retail distribution network.

78.   The Retail Supply and Retail Service Agreements between Source and members of its retail distribution network, are valid, binding contracts.

79.   Defendants have at all times been aware of the business relationships between Source and its retail customers.

80.   Defendants have at all times been aware of the conditions in the Retail Supply and Service Agreements.

81.   Defendants intentionally and unjustifiably have interfered with Source's business relationships and contractual agreements with Source's retail customers by making false statements regarding Source's financial status and continued existence as a magazine wholesaler.

82.   Defendants also have intentionally and unjustifiably interfered with Source's business relationships and contractual agreements with Source's retail customers by boycotting the distribution of single-issue magazines to Source without a legitimate business justification with the intent of harming its business.

83.   Source has been injured by the defendants, because, among other things, many of its retail customers are threatening the termination of their Retail Supply and Retail Service Agreements and their business relationships with Source, and seeking to obtain single-issue magazine product from alternative sources.

84.    Source's retail customers have threatened to terminate both their Retail Supply and Retail Service Agreements and their business relationships with Source, and are seeking to obtain magazine product from alternative sources, principally defendants Hudson and National News, as a direct and proximate cause of defendants' conduct.

85.    Plaintiffs were damaged by defendants' wrongful conduct.

## FOURTH CLAIM

### (Civil Conspiracy)

86.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 64, 72 through 75 and 77 through 85, as if fully set forth herein.

87.    The defendants conspired with one another to harm Source's reputation, to undermine Source's goodwill with its customers, to damage its business, and to destroy Source as a going concern.

88.    Each of the defendants have committed one or more of the following acts: boycotted the distribution of single-issue magazines to wholesaler Source with the intent of destroying it;  disparaged Source's business to its retail customers for the purpose of interfering with its business relationships and contractual agreements with those customers with the intent of forcing Source's customers to move their business to defendants Hudson and News Group; and raided Source's employees for the purpose of stealing its trade secrets and eliminating it as a competitor.

89.   Defendants undertook their wrongful, intentional and unjustifiable acts in furtherance of their ongoing conspiracy to destroy Source through, among other things, defamation and tortious interference.

90.   Plaintiffs were damaged as a result of the unlawful acts performed in furtherance of the conspiracy.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally, as follows:

(a)   Preliminarily and permanently enjoining defendants, their affiliates, successors, transferees, assignees, and the officers and directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner: (i) boycotting the distribution of single-issue magazines to Source; (ii) disparaging Source to its retail customers, publishers or any other persons; (iii) interfering with Source's business relationships and contractual agreements with its retail customers; and (iv) stealing Source's employees, trade secrets or intellectual property;

(b)   Preliminarily and permanently enjoining defendants, their affiliates, successors, transferees, assignees, and the officers and directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any plan, practice or device having a similar purpose or effect;

(c)   Preliminarily ordering that from the present until the conclusion of a trial on the merits that publisher defendants AMI, Bauer, Hachette, and Time and defendant national

distributors DSI, Curtis, Kable and TWR shall supply to Source the magazines that were being supplied by those defendants before January 15, 2008 on the same terms and conditions applicable to Source before January 15, 2008 but in no event worse than those received by defendants News Group and Hudson;

(d)     Permanently ordering that the publisher defendants AMI, Bauer, Hatchette and Time and defendant national distributors DSI, Curtis, Kable and TWR shall desist from their illegal boycott of Source and shall supply to Source the magazines that were being supplied by those defendants before January 15, 2008 on the same terms and conditions applicable to Source before January 15, 2008 but in no event worse than those received by defendants News Group and Hudson;

(e)     Declaring that the unlawful contract, combination and conspiracy alleged herein be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15. U.S.C. § 1;

(f)     On their First Claim, awarding plaintiffs treble their damages in an amount to be determined at trial;

(g)     On their Second, Third and Fourth Claims, awarding plaintiffs compensatory and punitive damages in amounts to be determined at trial;

(h)     Awarding plaintiffs their costs in the prosecution of this action, including reasonable attorneys' fees; and

(i)     Awarding plaintiffs such other and further relief as is just and proper.

## TRIAL BY JURY

Trial by jury is demanded on all issues so triable.


Dated: February 9, 2009

               KASOWITZ, BENSON, TORRES &
               FRIEDMAN LLP

         By: _____
                   Marc E. Kasowitz (mkasowitz@kasowitz.com)
                   Daniel R. Benson (dbenson@kasowitz.com)
                   Hector Torres (htorres@kasowitz.com)
                   Maria Gorecki (mgorecki@kasowitz.com)

               1633 Broadway
               New York, New York 10019
               Tel.: (212) 506-1700
               Fax: (212) 506-1800

               Attorneys for Source Interlink Distribution, L.L.C.
               and Source Interlink Companies, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

SOURCE INTERLINK DISTRIBUTION, L.L.C. and    :
SOURCE INTERLINK COMPANIES, INC.,            :
                                             :
                    Plaintiffs,              :
                                             :        VERIFICATION
            - against -                      :
                                             :
                                             :
AMERICAN MEDIA, INC., BAUER PUBLISHING CO.,  :
LP., CURTIS CIRCULATION COMPANY,             :
DISTRIBUTION SERVICES, INC., HACHETTE        :
FILIPACCHI MEDIA, U.S., HUDSON NEWS          :
COMPANY, KABLE DISTRIBUTION SERVICES, INC., :
THE NEWS GROUP, LP, TIME INC. and            :
TIME/WARNER RETAIL SALES & MARKETING,        :
INC.,                                        :
                                             :
                    Defendants.              :
------------------------------------------------------------------------ x

        DOUGLAS J. BATES, being duly sworn, deposes and says that he is the General

Counsel of Source Interlink Companies, Inc., a plaintiff in the above entitled action; that he has

read the foregoing Verified Complaint and knows the contents thereof; and that the same is true

to his own knowledge except as to the matters therein stated to be alleged upon information and

belief, and as to those matters he believes them to be true.

                                                            DOUGLAS J. BATES

Sworn to before me this
9th day of February, 2009

Notary Public

                                    LANA RAFAEL
                            Notary Public. State of New York
                                   No. 01RA6042271
                             Qualified in Kings County
                            Commission Expires May 22, 2010