UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

SOURCE INTERLINK DISTRIBUTION, L.L.C. and    :
SOURCE INTERLINK COMPANIES, INC.,            :
                                             :
                    Plaintiffs,              :
                                             :
        - against -                          :
                                             :
AMERICAN MEDIA, INC., BAUER PUBLISHING CO.,  :
LP., CURTIS CIRCULATION COMPANY,             :
DISTRIBUTION SERVICES, INC., HACHETTE        :
FILIPACCHI MEDIA, U.S., HUDSON NEWS          :
COMPANY, KABLE DISTRIBUTION SERVICES, INC.,  :
THE NEWS GROUP, LP, TIME INC. and            :
TIME/WARNER RETAIL SALES & MARKETING,        :
INC.,                                        :
                                             :
                    Defendants.              :

------------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Maria Gorecki (mgorecki@kasowitz.com)

KASOWITZ, BENSON, TORRES &
  FRIEDMAN LLP

1633 Broadway
New York, New York 10019
Tel.:      (212) 506-1700
Fax:       (212) 506-1800

*Attorneys for Plaintiffs Source Interlink Distribution
L.L.C. and Source Interlink Companies, Inc.*

## TABLE OF CONTENTS

Preliminary Statement.................................................................................................. 1

FACTS ......................................................................................................................... 3

    A.   The Parties ...................................................................................................... 3

    B.   Overview:  Single-Copy Magazine Sales ..................................................... 3

    C.   Inefficiencies in Traditional Distribution System........................................ 4

    D.   Source And Its Efforts to Remain Competitive ........................................... 5

    E.   The Conspiracy To Destroy Source And Steal Source's Business ................ 8

    F.   Source Will Suffer Irreparable Harm.......................................................... 13

THE RELEVANT MARKET ..................................................................................... 14

COMPETITION HAS BEEN INJURED BY THE CONSPIRACY ........................... 15

    G.   The Verified Complaint ............................................................................... 17

ARGUMENT ............................................................................................................. 17

I.    THE STANDARD FOR A TEMPORARY RESTRAINING ORDER  AND
    A MOTION FOR A PRELIMINARY INJUNCTION ......................................... 17

II.   PLAINTIFFS WOULD BE IRREPARABLY  HARMED ABSENT
    INJUNCTIVE RELIEF........................................................................................ 18

    A.   Destruction and Disruption of Source's Business ...................................... 18

    B.   Losses to Source's Customer Base, Good Will, and Reputation................... 19

    C.   Losses to Competitive Market And Potential Loss of Market Advantage ................. 21

III.  PLAINTIFFS HAVE A CLEAR  LIKELIHOOD OF SUCCESS ON THE MERITS ....... 22

    A.   Plaintiffs Have a High Probability of Success On the Merits of Their
    Antitrust Claims Under Section 1 Of The Sherman Act.................................. 22

        1.   Defendants' Conduct Is *Per Se* Illegal Under Section 1 of the Sherman Act.......... 23

        2.   Defendants' Conduct Violates Section 1 of the Sherman Act Even
        Under the Rule of Reason Test .......................................................... 27

a. Defendants' Conduct Should Be Analyzed Under the "Abbreviated" or "Quick Look" Rule-of-Reason  Analysis..............................................27

b. Even Under the Standard Rule of Reason, Defendants' Conduct Has Resulted in Severe Adverse Effects on Competition in the Relevant Market in Violation of the Sherman Act ..............................................27

    i.    The Relevant Market ..............................................28

    ii.   Adverse Effects On Competition ..............................................30

    1.    Actual Adverse Effects on Competition ..............................................30

    2.    Market Power..............................................32

B.   Source Has Demonstrated a Clear Showing of  Likelihood Of Success On he Merits Of Its Defamation Claims..............................................33

C.   Source Has Demonstrated a Clear Showing of Likelihood of Success on the Merits of Its Tortious Interference Claims..............................................36

    1.    A Business and Contractual Relationship Existed Between Source and Its Retailer Customers..............................................37

    2.    Defendants Knew of the Existing Business Relationships and Contractual Agreements Between Source and Its Retail Customers..............................................37

    3.    Defendants Intentionally and Unjustifiably Interfered With Source's Relationships With Its Retail Customers ..............................................38

    4.    Defendants Have Suffered, and Continue to Suffer, Significant Damage as a Result of Defendants' Conduct. ..............................................39

IV.  THE BALANCE OF HARDSHIPS OVERWHELMINGLY TIPS IN PLAINTIFFS' FAVOR ..............................................40

V.   CONCLUSION..............................................42

## TABLE OF AUTHORITIES

**Cases**

Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985).................................................. 22

Ahern v. Boeing Co., 701 F.2d 142, 144 (11th Cir. 1983) .......................................................... 38

Aim Int'l Trading L.L.C. v. Valcucine,
    No. 02 Civ. 1363 (PKL), 2002 U.S. Dist. LEXIS 10373 at *18-*19
    (S.D.N.Y. June 11, 2002)................................................................................................ 40

Army Aviation Heritage Found. & Museum, Inc. v. Buis,
    504 F. Supp. 2d 1254, 1259 (N.D. Fla. 2007)................................................... 34, 35

Bell & Howell: Mamiya Co. v. Masel Co. Corp.,
    719 F.2d 42, 45 (2d Cir. 1983).............................................................................. 18

Bogan v. Hodgkins, 166 F.3d 509, 515 (2d Cir. 1999)............................................................. 23

Byrd v. Hustler Magazine, Inc.,
    433 So. 2d 593, 595 (Fla. 4th Dist. Ct. App. 1983) ............................................ 33

California Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999) ....................................................... 27

Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,
    996 F.2d 537, 543 (2nd Cir. 1993)...................................................................... 30

Croton Watch Co. v. Nat'l Jeweler Magazine, Inc.,
    06 CV 662 (GBD), 2006 U.S. Dist. LEXIS 55753,
    at *12-13 (S.D.N.Y. Aug. 7, 2006)..................................................................... 35

Doninger v. Niehoff, 527 F.3d 41, 47 (2d Cir. 2008) ................................................................ 17

Eng v. Smith, 849 F.2d 80, 83 (2d Cir. 1988)............................................................................ 22

Ethan Allen, Inc. v. Georgetown Manor, Inc.,
    647 So. 2d 812, 814 (Fla. 1994)..................................................................... 36, 37

Ferris v. S. Fla. Stadium Corp.,
    926 So. 2d 399, 402 (Fla. Dist. Ct. App. 3d Dist. 2006)..................................... 38

Flash Elecs. v. Universal Music,
    312 F. Supp. 2d 379, 390 (E.D.N.Y. 2004) ............................................... passim

Full Draw Prods. v. Easton Sports, Inc.,
    182 F.3d 745, 751 (10th Cir. 1999) ............................................................ 25, 31

Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,
    386 F.3d 485, 506 (2d Cir. 2004)................................................................ 28, 41

Heavener, Ogier Servs. v. R. W. Fla. Region,
    418 So. 2d 1074, 1075 (Fla. Dist. Ct. App. 5th Dist. 1982) ....................... 37

Holzer Watch, Inc. v. Montres Universal, S.A.,
    No. 93 Civ. 6133 (RPP), 1993 U.S. Dist. LEXIS 16311 at *5-*6
    (S.D.N.Y. Nov. 18, 1993) ........................................................................... 40

Ibp, Inc. v. Hady Enters.,
    267 F. Supp. 2d 1148, 1163 (N.D. Fla. 2002)....................................... 33, 34

In re Digital Music Antitrust Litig.,
    06 MDL No. 1780 (LAP), 2008 U.S. Dist. LEXIS 79764, at *41
    (S.D.N.Y. Oct. 9, 2008) .............................................................................. 26

Jacobson & Co. v. Armstrong Cork Co.,
    548 F.2d 438 (2d Cir. 1977)................................................................... 20, 41

K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,
    61 F.3d 123, 129 (2d Cir. 1995)................................................................. 32

Keehfus Ltd. P'ship v. Fromkin Energy, LLC,
    1:06-CV-987 (GLSDRH), 2007 U.S. Dist. LEXIS 62319, at *7-10
    (N.D.N.Y Aug. 23, 2007) ............................................................................ 36

Lee v. Bankers Trust Co.,
    166 F.3d 540, 545 (2d Cir. 1999)............................................................... 33

Major League Baseball v. Salvino,
    542 F.3d 290, 317 (2d Cir. 2008)............................................................... 27

McIver v. Tallahassee Democrat, Inc.,
    489 So. 2d 793 (Fla. Dist. Ct. App. 1st Dist. 1986).................................... 34

Metzler v. Bear Auto. Serv. Equip. Co., SPX,
    19 F. Supp. 2d 1345, 1364 (S.D. Fla. 1998) .............................................. 39

Muze v. Digital On-Demand, Inc.,
    123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000)................................................ 21

Nautica Int'l v. Intermarine USA, L.P.,
    5 F. Supp. 2d 1333, 1344 (S.D. Fla. 1998) ................................................ 34

Northern Pacific Ry. Co. v. United States,
    356 U.S. 1, 5, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958)................................. 23

iv

Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,
    472 U.S. 284, 294, 105 S. Ct. 2613, 2619, 86 L. Ed. 2d 202, 211 (1985)................................. 24

O'Lone v. Estate of Shabazz,
    482 U.S. 342 (1987)........................................................................................................ 22

Petereit v. S.B. Thomas, Inc.,
    63 F.3d 1169, 1186 (2d Cir. 1995)................................................................................... 19

Phillip v. Fairfield Univ.,
    118 F.3d 131, 133 (2d Cir. 1997)..................................................................................... 17

Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC,
    317 F. Supp. 2d 301, 317 (S.D.N.Y. 2003)................................................................ 27, 33

Reborn Enterprises, Inc. v. Fine Child, Inc.,
    590 F. Supp. 1423, 1444 (S.D.N.Y. 1984)........................................................................ 24

Register v. Pierce,
    530 So. 2d 990, 993 (Fla. Dist. Ct. App. 1st Dist. 1988)................................................. 37

Register.com, Inc. v. Verio, Inc.,
    356 F.3d 393, 404 (2d Cir. 2004)..................................................................................... 20

Reuters, Ltd. v. United Press Int'l, Inc.,
    903 F.2d 904, 907 (2d Cir. 1990).......................................................................... 18, 19, 20

Rome Ambulatory Surgical Ctr. v. Rome Mem. Hosp.,
    349 F. Supp. 2d 389, 414 (N.D.N.Y 2004) ..................................................................... 24

Ruskin Co. v. Greenheck Fan Corp.,
    CASE NO. 08-CV-60902, 2008 U.S. Dist. LEXIS 94993, *6-7
    (S.D. Fla. Nov. 13, 2008)................................................................................................. 37

Salit v. Ruden,
    742 So. 2d 381, 385 (Fla. Dist. Ct. App. 4th Dist. 1999) ............................................... 38

SEC v. Cavanagh,
    155 F.3d 129, 132-36 (2d Cir. 1998) ............................................................................... 17

Taxi Weekly, Inc. v. Metropolitan Taxicab Bd. of Trade, Inc.,
    539 F.2d 907, 911 (2d Cir. 1976)..................................................................................... 26

Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001) ............................................ 28

Toledo Mack Sales & Serv. v. Mack Trucks, Inc.,
    530 F.3d 204, 220 (3d Cir. 2008)................................................................................ 24, 33

Tom Doherty Assocs. v. Saban Entm't, Inc.,
  60 F.3d 27, 35 (2d Cir. 1995)....................................................................... 18

Tops Markets, Inc. v. Quality Markets. Inc.,
  142 F.3d 90, 96 (2d Cir. 1998)..................................................................... 30

Unistar Corp. v. Child,
  415 So. 2d 733, 734 (Fla. Dist. Ct. App. 3d Dist. 1982)......................... 38, 39

United States v. Columbia Pictures Industries, Inc.,
  507 F. Supp. 412, 433 (S.D.N.Y. 1980)....................................................... 21

Warner-Lambert Co. v. Northside Dev. Corp.,
  86 F.3d 3, 6 (2d Cir. 1996)........................................................................... 17

Wolkowsky v. Garfunkel, 65 Fla. 10, 11 (Fla. 1913) ..................................... 34

**Other Authorities**

15 U.S.C. § 1 ........................................................................................... 1, 22

Plaintiffs Source Interlink Distribution L.L.C. ("Source") and Source Interlink Companies, Inc. ("Source Interlink") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 65, for a temporary restraining order and preliminary injunction.[1] By their motion, plaintiffs seek an order, among other things, enjoining defendants from boycotting Source as a wholesaler of defendants' magazines and otherwise attacking plaintiffs and their businesses.[2]

### Preliminary Statement

In this action, Source, a wholesaler of magazines to leading mass-merchandise retailers, bookstore chains, grocery stores and other retail outlets, and its parent Source Interlink seek a temporary restraining order and a preliminary and permanent injunction, enjoining defendants from continuing their collusive anti-competitive scheme -- in clear violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and common law -- to attack, disparage and destroy Source's business.

Emergency relief is necessary to prevent the imminent irreparable harm -- the destruction of Source's business and the monopolization of the United States wholesale distribution market for sell-through traditional retail magazines in the United States -- that the misconduct of defendants, major magazine publishers, their distributors and two of the only four major magazine wholesalers in the market will, if not restrained, doubtless cause.

As described below, defendants, in furtherance of their scheme have:  cut Source off from some of the nation's most popular magazines; spread disparaging rumors about Source and its

---

[1] Submitted herewith in support of the motion are the affidavit of Gregory Mays, sworn to February 8, 2009 ("Mays Aff."), the affidavit of Christopher Argentieri, sworn to February 8, 2009 ("Argentieri Aff."), the affidavit of Alan Tuchman, sworn to February 8, 2009 ("Tuchman Aff."), the affidavit of John Bode, sworn to February 8, 2009 ("Bode Aff."), and the declaration of Maria Gorecki, dated February 9, 2009 ("Gorecki Decl."). A copy of the verified complaint ("Ver. Compl.") is annexed as Exhibit 1 to the Gorecki Decl.

[2] See the proposed order to show cause submitted herewith.

financial condition to retailers, employees and others in the industry; encouraged Source's customers to cease doing business with Source through, among other things, such false rumors; sought to coerce Source into selling its distribution facilities to defendants at fire sale prices; and raided Source's employees and sought to steal Source's proprietary information.

If defendants' schemes are not stopped, Source's entire business, including its good will, reputation, 8,000-employee work force and customer base, will be destroyed. Indeed, defendants have already succeeded in destroying Anderson News, LLC ("Anderson"), the only other non-colluding wholesaler in the market, by recently cutting it off from all supplies of the publishers' magazines. Anderson announced on February 7, 2009 that it had no recourse but to cease normal business activities effective immediately.

Defendants' indisputable goal is to destroy Source's business so that defendants -- through Hudson News Company ("Hudson") and The News Group, LP ("News Group"), the two remaining wholesalers -- will monopolize the wholesale market and use that monopoly power to shift to retailers and consumers -- and away from publishers -- the entire financial burden resulting from worsening market conditions and inefficiencies in the distribution system from which publishers have benefited at the expense of retailers and wholesalers. Unlike the colluding wholesalers, Source refused to go along with the defendants' efforts to continue to impose the costs of such inefficiencies on the retailers rather than the publishers.

Absent intervention by this Court enjoining defendants from continuing to engage in their collusive anti-competitive and tortious conduct, the harm to competition in this market and to Source's distribution business, goodwill, reputation and customer base will be irreparable. Moreover, as shown below, plaintiffs have an overwhelming likelihood of success on the merits of their antitrust and other claims, and their motion should be granted.

2

## FACTS

### A.   The Parties

There are three major wholesalers, now that Anderson has been driven out of business, who sell to retail outlets publishers' magazines for single-copy sale at such outlets. Those wholesalers are plaintiff Source, defendant Hudson, and defendant News Group. National distributors are retained by publishers to broker and manage their relationships with the wholesalers. The defendant distributors are Curtis Circulation Company ("Curtis"), Kable Distribution Services, Inc. ("Kable") and Time/Warner Retail Sales & Marketing, Inc. ("TWR"), as well as Distribution Services, Inc. ("DSI"), a marketing consultant for publishers. The defendant magazine publishers are Bauer Publishing Co., LP. ("Bauer"), Hachette Filipacchi Media U.S., Inc. ("Hachette"), and Time Inc. ("Time"). (Ver. Compl. ¶¶ 7-19; Mays Aff. ¶¶ 1, 3-4.)

### B.   Overview:  Single-Copy Magazine Sales

The major United States magazine publishers, which publish the magazines and set their cover prices, include defendants Time, AMI, Bauer, and Hachette. To effectuate single-copy magazine sales (*i.e.*, non-subscription sales), each publisher retains a national distributor, which serves as a broker to manage the publisher's relationship with its wholesalers, provides marketing and accounting services to the publisher and guarantees the wholesaler's payment obligations to the publisher. (Ver. Compl. ¶ 23; Mays Aff. ¶ 4.)

The four U.S. national distributors are defendants TWR, Kable and Curtis, as well as Comag Marketing Group LLC ("CMG"). The national distributors are compensated with a percentage, typically two to five percent of the retail sales value of the magazines they handle. Defendant DSI, a subsidiary of AMI, provides sales and marketing services to publishers. (Ver. Compl. ¶ 24; Mays Aff. ¶ 4.)

3

Pursuant to allotment orders provided by the national distributors (which typically greatly exceed the number ultimately purchased by consumers), the publishers' magazines are shipped to wholesalers, who in turn, ship the magazines to retailers, including traditional mass merchandisers and grocery store chains, such as Wal-Mart and Kroger, as well as newsstands, convenience stores, airport terminals and other retail outlets, and specialty retailers like Barnes & Noble and Borders. (Ver. Compl. ¶ 25; Mays Aff. ¶ 5.)

Wholesalers are responsible for picking up, tabulating and destroying copies of magazines that remain unsold. Wholesalers buy the magazines from the publishers at a price of 50 to 60 percent of the cover price and sell to the retailers at a price of 70 to 75 percent of the cover price. Before defendants' conspiracy drove Anderson out of business, the market shares of the four wholesalers broke down as follows: Source 31%, Anderson 27%, Hudson 11% and News Group 21%. (Ver. Compl. ¶ 26; Mays Aff. ¶ 5.)

### C. Inefficiencies in Traditional Distribution System

The distribution system is plagued by gross publisher-induced inefficiencies that have imposed onerous and unnecessary costs on wholesalers. For example, publishers and national distributors customarily ship to wholesalers quantities of magazines that far exceed the number of magazines sold by the retailers. Wholesalers are forced to absorb the full cost of tabulating the unsold copies and transporting them back to their own facilities for disposal or destruction. (Ver. Compl. ¶ 27; Mays Aff. ¶ 6.)

A different system for distribution has been proposed, under which the retailers automatically would report sales of magazines through electronic checkout scanners and then dispose of unsold copies. (Ver. Compl. ¶ 28; Mays Aff. ¶ 7.)

The publishers, however, adamantly oppose the proposed system, because they supposedly would not be paid for, nor would their circulation numbers reflect, "shrinkage" -- *i.e.*,

sales that are not scanned as a result of machine error, estimated to be approximately five percent of all sales.  (Ver. Compl. ¶ 29; Mays Aff. ¶ 8.)

In addition to shipping excessive magazine copies, publishers and national distributors ship large numbers of unprofitable magazine titles, forcing the wholesaler to bear unnecessary costs of handling and returns.  Publishers and national distributors likewise have resisted efforts to curtail their ability to ship unprofitable titles.  (Ver. Compl. ¶ 30; Mays Aff. ¶ 9)

### D.   Source And Its Efforts to Remain Competitive

Source Interlink, which was founded in 1995 and has approximately 8,000 employees, commenced its business, which it conducts through Source, as a magazine wholesaler in 2001. In the traditional market, Source's operations are focused in 25 states throughout the West Coast, the mid-Atlantic and the mid-western Rust Belt.  Source has been engaged in business with defendants since 2001.[3]  (Ver. Compl. ¶ 31; Mays Aff. ¶ 10.)

During the past five years, Source has invested heavily in distribution equipment, wholesaling centers, technology, logistics and software.  The company also has sought to address with publishers and national distributors the unnecessary and burdensome costs caused by excessive supply and unprofitable titles.  (Ver. Compl. ¶ 32; Mays Aff. ¶ 11.)

On or about January 14 of this year, one of Source's wholesaler competitors, Anderson, announced that it would impose an additional $.07 per copy distribution fee for all magazine copies received, and would pass on to the publishers the carrying costs of inventory in retail chains where it had negotiated scan-based trading terms.  Before that announcement, Source had been conducting a title-by-title profitability study.  After Anderson issued its surcharge

---

[3]   Source Interlink is also a publisher of popular magazines.  In 2007, Source Interlink acquired more than 75 consumer magazines, 90 related Web sites, more than 65 events, television and radio programs, and approximately 400 branded products from Primedia Inc.  The new company, known as Source Interlink Media, made Source Interlink a leading special-interest magazine publisher in the United States, with well-known brands such as *Motor Trend, Automobile, Snowboarder* and *Soap Opera Digest.*

announcement, Source decided to issue an announcement stating that Source would impose a similar per copy distribution fee because this was an expeditious way to begin to address the cost challenges in this business. Source expected to continue to work with the publishers and national distributors to address fully the cost issues. Accordingly, Source announced a $.07 surcharge to be effective February 1, 2009, by a letter of January 19, 2009. (Ver. Compl. ¶ 33; Mays Aff. ¶ 12; Tuchman Aff. ¶ 2.)

The publishers and national distributors resisted the surcharge. As a result, shortly after Source's January 19th announcement, Source rescinded the surcharge, and all the publishers and national distributors (except one) told Source that they would continue to supply Source with magazines and discuss with Source alternative approaches for addressing the disproportionate cost burden imposed by excessive supply and unprofitable titles. (Ver. Compl. ¶ 34; Mays Aff. ¶ 13; Tuchman Aff. ¶ 3.)

Thus, during the week of January 26, 2009, Alan Tuchman, Source's President, and Chris Argentieri, Source's Senior Vice President, traveled to New York to meet with the major publishers and national distributors. On January 27, Tuchman and Argentieri met with Curtis's President and Chief Operating Officer Bob Castardi. Castardi stated that he would suggest an alternative approach for addressing the profitability issues within the following week, that any agreement be retroactive to February 1, 2009, and that Curtis would continue to ship magazines to Source. (Ver. Compl. ¶ 35; Mays Aff. ¶ 14; Tuchman Aff. ¶¶ 4-5.)

On January 27, Tuchman and Argentieri also met with Bauer's President and Chief Executive Officer, Hubert Boehle, its Senior Vice President, Rick Parker, and Executive Vice President Henning Lauer. Bauer offered to discuss other possibly mutually-beneficial changes,

such as helping to fund an expansion into Anderson territory and granting Source exclusivity in stores. (Ver. Compl. ¶ 36; Mays Aff. ¶ 15; Tuchman Aff. ¶ 6.)

On January 28, Tuchman confirmed to Parker that Source had rescinded the $.07 surcharge, and Parker confirmed that Bauer would grant Source exclusivity in certain retail outlets. (Ver. Compl. ¶ 37; Mays Aff. ¶ 16; Tuchman Aff. ¶ 7.)

On January 29, Source's Chief Executive Officer, Gregory Mays, spoke with defendant publisher AMI's President, David Pecker. Pecker told Mays that AMI did not have any business or credit issues with Source and assured Mays that AMI would continue to ship magazines to Source. (Ver. Compl. ¶ 38; Mays Aff. ¶ 17.)

On January 30, Mays confirmed to Pecker during a conference call that the $.07 surcharge was not applicable to AMI. Pecker stated that, if Curtis was on board -- which it had claimed to be -- AMI would continue to ship magazines to Source, and the parties would discuss the economics later. Curtis and Pecker stated that they would ensure that Bauer (which, notwithstanding the January 28 Tuchman-Parker conversation, had sent a January 30 termination notice) also would continue to supply magazines to Source. (Ver. Compl. ¶ 39; Mays Aff. ¶ 17.)

On January 30, during a Mays discussion with Curtis's Castardi and AMI's Pecker, Castardi agreed that Source was "within terms" and that Curtis had no business or accounting issue with Source. Having heard that AMI would continue to ship magazines to Source and that AMI had no issues with Source, Castardi expressly stated that Curtis -- "of course" -- would continue to ship to Source. (Ver. Compl. ¶ 40; Mays Aff. ¶ 18.)

On January 31, 2008, Mays had a very productive and cordial three-hour meeting with Rich Jacobsen, TWR's Chief Executive Officer, at his office, where Mays confirmed that the $.07 surcharge was rescinded and that Source wanted to continue a positive relationship with

TWR.  Jacobsen responded that the "door was still open" and that TWR had not entered into any

agreements with other wholesalers.  As a demonstration of Source's good faith, Mays agreed that

Source would accelerate payments on Monday, February 2, 2009, of amounts not yet due.

Jacobsen stated that he appreciated that gesture and he and Mays arranged to meet in New York

for dinner on Monday, February 2, 2009, to discuss further continuing the relationship.  Mays

believed it was a very positive meeting.  (Ver. Compl. ¶ 41; Mays Aff. ¶ 19.)

### E.    The Conspiracy To Destroy Source And Steal Source's Business

Despite the clear assurances to the contrary, the publisher and distributor defendants,

moving in virtual lockstep, abruptly and to Mays's shock, cut Source off from its supply of

magazines -- including the most popular titles, like *People* and *Sports Illustrated*.  At the same

time, the defendants launched a campaign in which certain of them spread false rumors to

Source's customers and others that Source was in deep financial trouble and had ceased

operations or was exiting the magazine wholesale business.  The goal of that coordinated

campaign was to do just that -- to put Source out of business.  At the same time that all the

defendants had cut Source off and defendants were spreading those lies, defendants were seeking

to acquire Source's distribution facilities and defendants were stealing Source's employees and

the proprietary intellectual property that those employees had used to run Source's business.

Simply stated, defendants have been destroying Source, and they are only a day or two away

from succeeding unless the interim relief plaintiffs seek is granted.  (Ver. Compl. ¶ 42; Mays

Aff. ¶ 20.)

Thus, for example, on January 27, 2009, TWR refused to supply Source with any Time

publications -- 20% of Source's business.  TWR also launched a disinformation campaign of

false statements concerning Source's financial condition and alleged liquidity problems.  And

even though Source was essentially current in its obligations to TWR, TWR disseminated an e-

mail to all of TWR's publishers stating that TWR no longer would continue to provide the traditional national distributor guarantee, common in the industry, of Source's payment for any products shipped to Source. (Ver. Compl. ¶ 43; Mays Aff. ¶ 21.)

On February 2, 2009, TWR distributed to all its "retail partners" a letter further disparaging Source, falsely stating that Source owed TWR tens of millions of dollars in outstanding payments and for "unsubstantiated deductions." The letter also falsely stated that TWR was forced to stop delivering Time product to Source because of its alleged "ultimatum imposing" an additional fee -- the previously announced $.07 surcharge that Source already had rescinded. Rumors instigated by TWR also surfaced during this time, including the false rumors that Source was filing for bankruptcy and that it had ceased all operations. (Ver. Compl. ¶ 44; Mays Aff. ¶ 22.)

TWR, however, was not acting alone. Defendants DSI, Hachette, Hudson and Time stopped shipping magazines to Source. Defendants Curtis, Bauer and AMI, and other defendant publishers, which together constituted 60% of Source's business, also were attacking Source. (Ver. Compl. ¶ 45; Mays Aff. ¶ 23.)

Notwithstanding their assurances, on Monday, February 2, 2009, within minutes of Source's making a payment to its national distributors of more than $60 million ($25 million of which was paid to TWR), Curtis, Bauer and Kable sent letters to Source reneging on their commitment to continue supplying product to Source. TWR also immediately issued its disparaging letter to its "retail partners" on that same day. In addition, David Pecker of AMI called Mays on the afternoon of February 2 and told Mays that AMI would stop supplying product to Source. Pecker claimed that AMI had no choice because it had to follow the lead of its distributor, Curtis, who also would stop supplying product to Source. Mays also learned that

-- at the same time that AMI had been representing that it would continue to supply Source, *i.e.*, on January 29, 2009, DSI -- a subsidiary of AMI -- was diverting product intended for Source to Hudson and News Group. (Ver. Compl. ¶ 46; Mays Aff. ¶ 23.)

Moreover, a Source executive was advised by the president of Curtis that, on January 31, he (Curtis) knew -- with "100% certainty" -- that TWR, Bauer and AMI would refuse to supply product to Source. Castardi obviously knew that if he had disclosed the truth to Source on January 31, *i.e.*, that Curtis was acting in concert with the others and they all intended to cut off Source's supply of magazines, Source would not have transferred more than $20 million to Curtis on February 2. (Ver. Compl. ¶ 47; Mays Aff. ¶ 24; Argentieri Aff. ¶ 2.)

The goal of TWR and its co-conspirators was clear: by cutting the life blood of Source's business -- 80% of its magazine product -- Source would be eliminated as a competitor and, more importantly, Source would be forced to sell at a "fire sale" its business infrastructure -- including its trucking fleet, distribution equipment and distribution centers -- to its wholesale competitors, Hudson and News Group. Indeed, TWR and its co-conspirators already had been negotiating with both Hudson and News Group to accomplish this part of its scheme, which involved dividing the U.S. distribution territory into two regions -- one controlled by Hudson and the other controlled by News Group. Thus, on February 2, 2009, TWR announced that it already reached agreements with other wholesale partners, and in a separate letter, TWR stated that, effective February 1, Marketforce, a TWR-related company, would assume responsibility for billing, sales and marketing. (Ver. Compl. ¶ 48; Mays Aff. ¶ 25.)

During Mays's planned February 2 dinner meeting in New York with Rich Jacobsen, Jacobsen made clear why Source was being terminated. In a total about-face from their meeting on Saturday, Jacobsen declared that there would be no conversation about supply because TWR

would not be supplying any magazines to Source.  During that dinner, Mays asserted to Jacobsen that with the distribution system being created by him and others, there would be no scanning-based trading, the wholesalers would force reduced margins down to the retailers rather than to the publishers, and there would be absolute control over the market.  Jacobsen's response was: "Exactly -- we now control this space."  (Ver. Compl. ¶ 49; Mays Aff. ¶ 26.)

Jacobsen's boastful admission to Mays is in striking contrast to his pretexts for cutting off Source's magazine supply in another false and defamatory letter that he sent to retailers several days later.  In a February 5, 2009 letter, Jacobsen said that the supply of magazines to Source was terminated because (a) Source and Anderson had "put a gun to our head" through the "sudden and simultaneous imposition of a $.07 per copy fee," and (b) Source was an "unreliable wholesaler[ ]," which failed to pay its bills.  Both statements are false.  (Ver. Compl. ¶ 50; Mays Aff. ¶ 27; Bode Aff. ¶ 2.)

First, Jacobsen was well aware -- and his letter admits -- that Source had rescinded the $.07 fee before the date the fee was to take effect and several days before he sent the letter.  TWR, however, proceeded with the termination anyway because it was only through such termination that TWR and the other distributors and publishers would be able to, as Jacobsen had put it, "control this space."  (Ver. Compl. ¶ 51; Mays Aff. ¶ 28.)

Second, contrary to Jacobsen's attempt to disparage Source as an unreliable wholesaler which did not pay its bills, Source was always current on its payment obligations to TWR, although issues arose with respect to, among other things, the amounts and timing of credits owed by TWR to Source for marketing services provided by Source.  Such issues typically arise in the ordinary course of business in this industry and are being invoked by Jacobsen now merely as a pretext for cutting off Source's supply.  Indeed, in connection with one of these disputed

11

issues, Source made a $25 million payment to TWR on February 2, 2009, at virtually the same time Jacobsen was claiming that Source was not paying its bills and, again, several days before he sent his February 5 letter. (Ver. Compl. ¶ 52; Mays Aff. ¶ 29.)

This is truly part of an orchestrated campaign to destroy Source as part of a scheme to eliminate competition among wholesale distributors and to enable the publishers to control this market. Most recently, defendants have been stealing Source's employees. On Friday, February 6, wholesaler News Group, which evidently is acting in concert with TWR, began raiding the key employees in Source's Wisconsin, Minnesota, South Dakota, Iowa, Michigan and Chicago territories, and, Source believes, stealing the intellectual property used by those employees to run Source's business. News Group has solicited and recruited several of Source's directors for that region and already has employed two of Source's directors, Dave Deitrich and Jack Foerst. For example, Deitrich appears poised to take more than 100 of Source's other employees from that region. News Group reportedly is attempting to exploit Source's employees' (many of whom are single mothers) fear of unemployment through job offers premised on the condition that the jobs be accepted immediately. (Ver. Compl. ¶ 53; Mays Aff. ¶ 30.)

The defendants' scheme has already succeeded in enabling them to charge higher prices. The wholesaler defendants have already begun to serve retailers previously served by Anderson, and, when signing agreements with those retailers, have negotiated higher rates for "[a]bout 80%" of the new business. In one instance, for example, TNG was able to reduce the cover-price discounts received by retailer Kroger from 27% to 26% (in other words, Kroger now pays 74% of the magazine cover price, whereas previously it paid 73%), made possible solely by defendants' conspiracy. This represents a 1.37% price increase -- 74% of the cover price minus 73% of the cover price, divided by the rate, 73% of the cover price, equals 1.37% -- for the exact

same products Kroger was receiving through Anderson. An e-mail, which Source has been told by a publisher is from Curtis, describes that increase. Source also understands that Hudson has already imposed price increases in Pennsylvania. (Ver. Compl. ¶ 53; Mays Aff. ¶ 31.)

**F.    Source Will Suffer Irreparable Harm**

Absent intervention by this Court enjoining TWR, Curtis, Kable, Bauer, AMI, DSI, Hachette and Time to resume the supply of product to Source, the harm both to competition in this market and to Source's distribution business, good will, reputation and customers, will be irreparable. Defendants' conduct already has caused enormous damage. One of Source's important customers, Supervalu, for example, immediately sent a letter to Source on February 2, 2009, referring to TWR's termination letter and advising that the loss of that business "would result in material reduction of available popular titles by approximately fifty percent," that Supervalu was being placed in "an unacceptable position," and that, if Source is unable to ship that product, "Supervalu will have no choice but to seek these titles elsewhere." Another important customer, Kroger, sent a letter to Source on February 5 stating that Kroger "has been informed that Source Interlink is currently unable to supply to Kroger" certain magazine titles and advising that Kroger is "seeking to obtain these titles from alternative sources." (Ver. Compl. ¶ 55; Mays Aff. ¶ 32.)

Defendants' attack on Source is resulting in an anti-competitive monopoly in the magazine distribution business. In addition to Jacobsen's February 2 boast, the e-mail Source has been told is from Curtis is just another admission that the destruction of Source and Anderson will create a "monopolistic wholesaler" with the power to dominate the market. (Ver. Compl. ¶ 56; Mays Aff. ¶ 33.)

If defendants are not enjoined, both plaintiffs will be caused to fail. (Bode Aff. ¶ 3.)

13

## THE RELEVANT MARKET

The relevant product market for the purposes of this action is the national market for the wholesale distribution of single-issue magazines.  The four major wholesale distributors of single issue magazines in the United States -- Source, Anderson, Hudson and News Group, sell hundreds of magazine titles to thousands of retailers across the country.  These wholesalers introduce great efficiencies into the market.  By purchasing from wholesalers, retailers receive an enormous savings of time and expense by allowing them to purchase from a single source with an established distribution network. (Ver. Compl. ¶ 57).

To obtain these savings, retailers obtain all of their product from the wholesale network, comprised of the four wholesale distributors, and do not deal directly with publishers or national distributors.  Because of the sheer number of publishers and their publications, it would be prohibitively expensive for retailers to obtain their magazines outside of the wholesale market, as it would require them to:  contact each individual publisher; negotiate prices for and order each individual publication; and physically transfer those magazines to their retail outlets -- that is, take over the functions performed by the wholesalers and national distributors.  Because of these costs, retailers are unable to substitute the magazines obtained through the wholesale network with magazines obtained from some other source.  As a result, retailers must continue to utilize the wholesale network even if the prices in that market rise.  (Ver. Compl. ¶ 58).

Because of the costs involved in developing and maintaining the distribution network necessary to transport millions of magazines to thousands of different retail outlets -- including distribution centers, freight depots, fleets of trucks, and thousands of employees -- the wholesale distribution market is characterized by high barriers to entry.  These entry barriers are reinforced through the exclusive distribution agreements involving wholesalers, national distributors and publishers. (Ver. Compl. ¶ 59).

## COMPETITION HAS BEEN
## INJURED BY THE CONSPIRACY

Defendants' actions unduly restrain, hinder and suppress competition among wholesalers in the national market for the wholesale distribution of single-copy magazines. Defendants, directly and proximately, have caused antitrust injury because, and absent injunctive relief, their actions will result in the elimination of Source as a wholesale distributor, thereby directly and substantially reducing the output of magazines and directly and substantially reducing the ability of retailers to obtain those magazines. Defendants' conduct also has allowed them to force retailers to pay higher prices (in the form of reduced discounts) as already has been experienced with certain of the new agreements negotiated by Hudson and News Group. The purposeful and wrongful destruction of plaintiffs' business by defendants directly has harmed both competition in the relevant market as well as plaintiffs. (Ver. Compl. ¶ 60; Bode Aff. ¶ 3).

Defendants' conduct has reduced the output of magazines through the wholesale market. Source and Anderson, combined, distribute 50 percent of all U.S. single-copy magazines, and in many instances are the only wholesale distributors operating in a numerous geographic regions. Because of defendants' unlawful boycott, wholesale distributors are unavailable to serve retailers in those areas, and those retailers have been denied access to defendants' magazines -- which means, in turn, that the retailers' customers have access to fewer magazines as well. (Ver. Compl. ¶ 61).

Moreover, absent injunctive relief, plaintiffs will be forced to exit the market, and, in areas where Source has the only viable distribution operations, it will be weeks or months before magazines can be delivered to retailers in those markets, if ever. Magazine publishers are paid based only on the number of magazines sold, not the number of magazines produced, which means that, unless magazines make it onto store shelves, publishers will not receive income on

the magazines they publish. Many smaller publishers depend on regular nationwide distribution, and some will be unable to survive a disruption in sales of even a few weeks. Many are likely to be forced to shut down. This will permanently reduce the choices available to retailers and their customers, and correspondingly benefit the remaining large publishers in the marketplace -- including defendants AMI, Bauer, Hachette and Time. (Ver. Compl. ¶ 62).

Defendants already have begun charging retailers higher prices for the same products, and, if defendants succeed in forcing Source to exit the market, defendants will continue to raise the prices paid by retailers. For example, as a result of the defendants' boycott, News Group has begun to distribute to retailers previously served by Anderson. As it has done so, it has been "re-signing" those retailers at a higher rate than what they paid Anderson, forcing the retailers to pay a higher portion of each magazine's cover price. News Group's ability to charge these higher prices is not the result of any inherent or earned competitive advantage, but has instead arisen solely as a result of the increased market power it has obtained by participating in the collusive boycott of Source and Anderson. (Ver. Compl. ¶ 63).

Indeed, News Group and Hudson stand to acquire monopolistic market power. Once defendants' conspiracy to destroy the wholesale business of plaintiff succeeds, a virtual certainty absent injunctive relief, News Group and Hudson together will control more than 90% of the U.S. wholesale magazine distribution market and, more importantly, each will control more than 90% of the market in its allocated territories. In light of defendants' anti-competitive conduct in obtaining this market power, there are substantial grounds to believe that defendants' acquisition of market power will harm competition market-wide. (Ver. Compl. ¶ 64).

### G.     The Verified Complaint

In the verified complaint, plaintiffs assert claims for violation of the Sherman Act,

defamation, tortious interference and civil conspiracy to commit tortious acts, including

defamation and tortious interference.

## ARGUMENT

### I.     THE STANDARD FOR A TEMPORARY RESTRAINING ORDER AND A MOTION FOR A PRELIMINARY INJUNCTION

In this Circuit, a party is entitled to a temporary restraining order and/or preliminary

injunctive relief when it has shown (1) irreparable harm; and (2) either (i) a likelihood of success

on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground

for litigation, with a balance of hardships tipping decidedly in the movant's favor.  Doninger v.

Niehoff, 527 F.3d 41, 47 (2d Cir. 2008); Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d

3, 6 (2d Cir. 1996).[4]

Each of these elements is met here, and thus the Court should grant plaintiffs' motion for

a temporary restraining order and preliminary injunction.

---

[4]     In certain narrow circumstances not applicable here, the standard is more stringent.  Where "an injunction is mandatory -- that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act" or "where the issuance of the injunction would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial," the moving party "must meet a higher standard than in the ordinary case," Phillip v. Fairfield Univ., 118 F.3d 131, 133 (2d Cir. 1997) -- i.e., the moving party must show a "substantial, or clear showing of, likelihood of success."  Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 35 (2d Cir. 1995).  See also SEC v. Cavanagh, 155 F.3d 129, 132-36 (2d Cir. 1998) (applying heightened standard to certain requests for injunctive relief and ordinary standard to other requests for injunctive relief).

As shown herein, plaintiffs easily meet the higher standard.  However, none of the circumstances justifying that standard is present here.  Plaintiffs seek to preserve the status quo that existed during seven years of course of dealings -- until last week when defendants suddenly and illegally boycotted Source, within days of falsely assuring Source they would not do so.  At a minimum, defendants should, under these circumstances, be estopped from arguing that the injunctive relief sought alters the status quo.  Moreover, the relief sought here would not provide plaintiffs with all the relief they seek and the relief can be "undone" by being lifted at any time.

## II.   PLAINTIFFS WOULD BE IRREPARABLY HARMED ABSENT INJUNCTIVE RELIEF

A showing of "probable irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Reuters, Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (quoting Bell & Howell: Mamiya Co. v. Masel Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983)). Thus, courts generally determine whether the movant has made such a showing first, before considering the other requirement for injunctive relief. Id. "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." Tom Doherty Assocs., 60 F.3d at 37 (quotations omitted).

### A.   Destruction and Disruption of Source's Business

Defendants' anti-competitive and illegal scheme -- launched this past week -- has included:

- the sudden cutting off of up to 80% -- virtually all -- of Source's magazine supplies immediately after defendants had assured Source they would continue to supply Source in accordance with a seven-year course of dealing;

- a campaign of false and defamatory rumors disparaging Source directed to Source's customers, key employees and others in the industry;

- the poaching of Source's customers and key employees; and

- the misappropriation of Source's proprietary information.

The Second Circuit has routinely recognized that the loss of an entire business cannot be compensated by monetary damages, and therefore constitutes irreparable harm. See Tom Doherty Assocs., 60 F.3d at 38 ("Where the loss of a product will cause the destruction of a business itself. . . the availability of money damages may be a hollow promise and a preliminary injunction appropriate"). Even just the *disruption* of a business can be as harmful as its termination and thereby constitute irreparable injury." Petereit v. S.B. Thomas, Inc., 63 F.3d

18

1169, 1186 (2d Cir. 1995) (awarding injunctive relief where breach of franchise agreement substantially impacted business) (emphasis added).

Defendants' collusive actions are directly aimed at eliminating Source as a magazine wholesaler, by, among other things, refusing to supply Source with magazine products. Defendants' magazine products account for approximately 80% of Source's business, and Source's wholesale business is collapsing without immediate resumption of supply.

Defendants' clear goal is to destroy the businesses of Source and Anderson so that defendants -- through Hudson and News Group, the two remaining wholesalers -- will monopolize the wholesale market and use that monopoly power to shift to retailers and consumers -- and away from publishers -- the entire financial burden of worsening market conditions and publisher-induced inefficiencies. Defendants already have succeeded in destroying Anderson, which announced on February 7, 2009 that it was forced to cease business activities effective immediately. Absent injunctive relief, defendants will succeed in destroying Source's wholesale magazine business as well.

### B.    Losses to Source's Customer Base, Good Will, and Reputation

Moreover, the loss of customer base, good will and reputation constitutes irreparable harm. In Reuters, 903 F.2d at 907-08 , the Second Circuit overturned the district court's finding of no irreparable injury where the supplier of foreign news pictures threatened to stop providing those pictures to its distributor, a national wire service. The court determined that the supplier's news pictures were a "unique product" and the fact that customers "expect[ed] and rel[ied] on the distributor for a continuous supply of that product almost inevitably create[d] irreparable damage to the good will of the distributor." Id. at 908-09. The irreparable harm in Reuters was "particularly evident when many of the distributor's customers ha[d] indicated not only a strong

19

preference for the terminated product but also ha[d] threatened to stop dealing with the distributor if it [could not] continue to supply that product." Id. at 909.

Similarly, in Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 440 (2d Cir. 1977), the Second Circuit affirmed the district court's granting of a mandatory preliminary injunction for a distributor of acoustical ceiling products whose distributorship had been wrongfully terminated by its supplier. Under the mandatory preliminary injunction, the defendant-supplier was restrained from terminating plaintiff as an authorized distributor of the supplier's products, and was directed to sell its products to plaintiff on nondiscriminatory terms. Id. The Second Circuit affirmed the district court's order and found that the plaintiff's "ample evidence" of threatened loss of goodwill and customers supported a finding of irreparable harm that could not be rectified by monetary damages. Id. at 445; see Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004) ("A company's loss of reputation, good will, and business opportunities from a breach of a contract can constitute irreparable harm justifying a preliminary injunction").

Defendants' collusive activities are aimed directly at destroying Source's customer base, good will and reputation. Defendants' magazines are unique products, and Source's retail customers depend on Source for a continuous supply. If Source does not receive magazines from defendants, it will not be able to provide these magazines to its retail customers. As there are no substitutes for these specific magazines, Source will be unable to remedy the situation, and Source's retail customers will be forced to use alternate magazine wholesalers. In fact, one of Source's important customers, Supervalu, has already sent a letter to Source advising that the loss of business threatened by defendants' actions "would result in material reduction of available popular titles by approximately fifty percent," that Supervalu was being placed in "an

unacceptable position," and that, if Source is unable to ship that product, "Supervalu will have no choice but to seek these titles elsewhere."  (Mays Aff. Exh. K.)

Moreover, defendants, in furtherance of their scheme, have made false statements and spread false rumors to many of Source's retail customers concerning, among other things, Source's financial status and impending departure from the magazine wholesale industry, in an effort to force these retailers to use the only alternative wholesalers -- that is, News Group or Hudson.  These false statements constitute a direct attack on Source's good will and reputation with its retail customers.

Absent an injunction, defendants' actions will only continue and Source will sustain even greater irreparable losses to its customer base, good will, and reputation.

C.     **Losses to Competitive Market And Potential Loss of Market Advantage**

Courts in the Second Circuit have found that the loss of a competitive market constitutes irreparable harm, see United States v. Columbia Pictures Industries, Inc., 507 F. Supp. 412, 433 (S.D.N.Y. 1980) (preliminary enjoining defendants' joint venture because it would have caused an "irreparable alteration of the marketplace"), as does the loss of a competitor's market share, see Muze v. Digital On-Demand, Inc., 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000) ("The potential loss of market advantage has been recognized to constitute irreparable harm").  In this case, both harms are present.  Should Source exit the marketplace, the market's high barriers to entry will dissuade future competitors from taking its place.  And those same entry barriers will apply to Source as well -- once it has lost its distribution networks and retailer relationships, returning to the marketplace will be prohibitively expensive.

III.   **PLAINTIFFS HAVE A CLEAR
       <u>LIKELIHOOD OF SUCCESS ON THE MERITS</u>**

To demonstrate a likelihood of success on the merits, plaintiffs "need not show that

success is an absolute certainty." <u>Eng v. Smith</u>, 849 F.2d 80, 83 (2d Cir. 1988) (quoting <u>Abdul</u>

<u>Wali v. Coughlin</u>, 754 F.2d 1015, 1025 (2d Cir. 1985), <u>overruled on other grounds by</u> <u>O'Lone v.</u>

<u>Estate of Shabazz</u>, 482 U.S. 342 (1987)).  Rather, plaintiffs "need only to make a showing that

the probability of [their] prevailing is better than fifty percent," notwithstanding that "[t]here

may remain considerable room for doubt." <u>Id.</u>  Even assuming <u>arguendo</u> that the heightened

standard for mandatory relief applied (<u>see</u> <u>supra</u> at n. 4), plaintiffs must only demonstrate that

their "cause is considerably more likely to succeed than fail." <u>Eng</u>, 849 F.2d at 82 (quoting

<u>Abdul Wali</u>, 754 F.2d at 1026).  Plaintiffs easily meet both of these standards.

   A.   **Plaintiffs Have a High Probability of Success On the Merits
        <u>of Their Antitrust Claims Under Section 1 Of The Sherman Act</u>**

Defendants here have conspired to refuse to deal with plaintiffs in order to increase the

prices charged to retailers in the retail magazine marketplace, a conspiracy in restraint of trade in

violation of Section 1 of the Sherman Act, which makes illegal every "contract, combination in

the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1.  Defendants

have engaged in both horizontal and vertical concerted action with the express purpose of

freezing Source and one of its competitors, Anderson, out of the wholesale magazine market.  As

a direct result of the defendants' intentional and collusive conduct, Source has been, and

continues to be, unable to distribute up to 80% of the product that its retailer-customers need.

At the same time, defendants have conspired to allocate, geographically and otherwise,

the remaining market share in the wholesale business -- comprising at least 90% of the wholesale

market -- between defendants Hudson and News Group, the only significant wholesalers that will

remain after Source's all-but-inevitable departure and Anderson's departure this past Saturday.

The defendants intend to acquire the assets of Source and Anderson (at heavily discounted "fire sale" prices), and utilize these assets to make a "smooth transition" into Source's and Anderson's former geographic territories, which they have split between themselves.  Moreover, the defendants collusively agreed that the wholesalers would pass increases in costs *down* to the retailers, rather than *up* to distributors and publishers.  Indeed, they already have raised prices.

Because of this, magazine retailers, who must continue to deal with the wholesaler defendants in order to obtain magazines to stock their shelves, will face a market with only two participants who have, expressly and in violation of state and federal antitrust laws, divided the market.  As a direct result, and as the express goal of defendants' conspiracy, defendants will utilize -- and, in the case of some of Anderson's former retailer-customers, have already begun utilizing -- the market power they have coercively gained to force retailers to pay higher prices for the same products they received previously, to the exclusive benefit of the defendants, and to the widespread detriment of retailers and consumers.

As shown below, defendants' conduct is *per se* violative of Section 1 of the Sherman Act, and would be illegal even if this Court were to utilize the rule of reason test.

1.     **Defendants' Conduct Is *Per Se* Illegal Under Section 1 of the Sherman Act.**

In antitrust law, there are "certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958).  "Generally, group boycotts are illegal *per se*." Bogan v. Hodgkins, 166 F.3d 509, 515 (2d Cir. 1999).  Courts apply the *per se* approach to "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or

coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" NW. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 294, 105 S. Ct. 2613, 2619, 86 L. Ed. 2d 202, 211 (1985) (citation omitted).

A *per se* illegal boycott is "an agreement among competitors within the same market tier not to deal with other competitors or market participants." Rome Ambulatory Surgical Ctr. v. Rome Mem. Hosp., 349 F. Supp. 2d 389, 414 (N.D.N.Y 2004) (citations omitted); see also Reborn Enters, Inc. v. Fine Child, Inc., 590 F. Supp. 1423, 1444 (S.D.N.Y. 1984) (same). "Such concerted action is usually termed a horizontal restraint, in contradistinction to combinations of persons at different levels of the market structure, e.g., manufacturers and distributors, which are termed vertical." Id. In this case, concerted action, in clear violation of the Sherman Act, has been taken -- and, unless this Court grants relief, will continue to be taken -- by two linked sets of horizontal competitors: the wholesaler defendants on the one hand, and the distributor and publisher defendants on the other.

The wholesaler defendants have "'persuad[ed] . . . [distributors and publishers] . . . to deny relationships [Source and Anderson] need in the competitive struggle.'" NW. Wholesale, 472 U.S. at 294. By persuading the distributor and publisher defendants to boycott Source and Anderson, the wholesaler defendants seek to eliminate their only two rivals from the marketplace, and gain market power through which they can raise prices. Moreover, the wholesaler defendants have, in concert with each other and with the other defendants, entered into agreements geographically allocating the wholesale magazine market in the United States. This is *per se* illegal. See Toledo Mack Sales & Serv. v. Mack Trucks, Inc., 530 F.3d 204, 220 (3d Cir. 2008) (denying summary judgment on Section 1 claim, since horizontal agreement

between distributors to allocate competition amongst themselves in order to keep prices high was *per se* unlawful).

What is more, the distributor defendants -- who, on an individual basis, could not have forced either Source or Anderson, much less both firms, out of the marketplace -- have colluded among themselves and the publisher defendants in their boycott of Source and Anderson. The benefits they stand to receive from this conduct are obvious: when Source and Anderson have been forced to exit the wholesale market, there will be only two remaining wholesale firms -- both of whom have, explicitly or implicitly, agreed not to pass cost structure deficiencies up to the distributor and publisher defendants. The result will be higher prices paid by retailers and their customers, and monopoly profits reaped by defendants throughout the wholesale chain.

This is also *per se* illegal. As noted above, "'a group boycott can only exist between conspirators who compete at the same market level.'" Full Draw Prods. v. Easton Sports, Inc., 182 F.3d 745, 751 (10th Cir. 1999) (citation omitted). But "the competitors need not be at the same market level *as the plaintiff*;" instead, there simply "'must be concerted activity between two or more competitors at [the] same market level.'" Id. (emphasis added, citation omitted). Thus, the concerted horizontal action by the distributor and publisher defendants to boycott Source, a wholesaler, is a *per se* violation of the Sherman Act. In Full Draw, for example, the Tenth Circuit held that "[a] group boycott . . . by large customers to destroy one producer [] in favor of another over which it had influence and could obtain advantage at the expense of other consumers, states a violation of the Sherman Act." Id. Similarly, here, the distributor and publisher defendants have chosen to collaborate in the intentional destruction of one of their customers, in favor of two other customers over which they "ha[ve] influence" due to agreements made in furtherance of the conspiracy.

25

Even at this pre-discovery stage, there is substantial evidence of defendants' collusive anti-competitive behavior. For example, on the same day, February 2, distributors Curtis and Kable, and publisher Bauer, each sent a letter to Source stating that they would not continue supplying magazines to source. (See May Aff. Exhs. G, H.) This in itself is evidence of collusion. See Taxi Weekly, Inc. v. Metro. Taxicab Bd. of Trade, Inc., 539 F.2d 907, 911 (2d Cir. 1976) (plaintiff sufficiently proved defendants acted in concert in boycotting trade publication when after meeting of defendants' trade association, all defendants cancelled their subscriptions within single half-hour period); In re Digital Music Antitrust Litig., 06 MDL No. 1780 (LAP), 2008 U.S. Dist. LEXIS 79764, at *41 (S.D.N.Y. Oct. 9, 2008) ("an inference of prior agreement may be warranted from simultaneous parallel price conduct where no actor had prior knowledge of or time to consider the other actors' conduct"). Moreover, at least one publisher who spoke with Curtis was told that defendants Hudson and TNG "are picking up the retailers between them." (Mays Aff. Exh. J.) More importantly, that publisher was told that any "concern about working with a large and monopolistic wholesale group" -- i.e. defendants Hudson and TNG -- would be "alleviated" by the fact that the wholesaler defendants were indeed able to raise prices for retailers, alleviating "some of the pressure on publisher discounts to wholesalers." (Id.) As the publisher notes, "the wholesalers, *under the vigilant stewardship of Curtis and, presumably, the other National Distributors*, have learned their lesson about going after unprofitable business." (Id. (emphasis added).) Indeed -- the wholesalers have abandoned the "unprofitable business" of participating in a competitive market, and have implemented this collusive scheme in violation of well-established antitrust laws.

2.   **Defendants' Conduct Violates Section 1 of the Sherman Act Even Under the Rule of Reason Test**

    a.   **Defendants' Conduct Should Be Analyzed Under the "Abbreviated" or "Quick Look" Rule-of-Reason Analysis**

Where the "'great likelihood of anti-competitive effects'" -- one of the requirements under the rule of reason -- "'can easily be ascertained,'" the "quick look" or "abbreviated" rule of reason analysis may be invoked. Major League Baseball v. Salvino, 542 F.3d 290, 317 (2d Cir. 2008) (quoting Calif. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999)). Quick look analysis has been used when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anti-competitive effect on customers and markets." Calif. Dental, 526 U.S. at 770.

The anti-competitive effects here -- as well as the lack of *any* "plausible" procompetitive effects whatsoever -- are obvious. Defendants have acted in a concerted fashion to reduce *by half* the competition in the wholesale magazine distribution market. At the same time, the remaining participants in that market have agreed to fix the prices at which they obtain magazines to sell to retailers, in turn requiring that any necessary price increases be borne only by retailers. It does not require more than a "rudimentary understanding of economics" to conclude that this conduct has had, and will continue to have, a significant anti-competitive effect on consumers and the markets.

    b.   **Even Under the Standard Rule of Reason, Defendants' Conduct Has Resulted in Severe Adverse Effects on Competition in the Relevant Market in Violation of the Sherman Act**

"Under the rule of reason approach, a court must evaluate 'whether the anticompetitive effects of a restraint are outweighed by some procompetitive justification.'" Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC, 317 F. Supp. 2d 301, 317 (S.D.N.Y. 2003) (citation omitted).

27

When a plaintiff's claim is analyzed under the rule of reason, the plaintiff bears the initial burden of demonstrating that "the defendants' challenged behavior 'had an *actual* adverse effect on competition as a whole in the relevant market.'" Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 506 (2d Cir. 2004) (citation omitted, emphasis in original).  Defendants' conduct here has had, and continues to have, irreversible and "actual" adverse effects in the marketplace.  The output of magazines distributed to retailers, and thus to consumers, has dropped precipitously.  And at the same time, the defendants have already begun raising prices on the magazines that are still being sold to retailers.  Defendants' conduct is clearly illegal under the rule of reason.

### i.   The Relevant Market

Under the rule of reason, a plaintiff must "properly define a relevant market where the alleged anticompetitive effects are being felt." Flash Elecs. v. Universal Music, 312 F. Supp. 2d 379, 390 (E.D.N.Y. 2004).  Market definition is "a deeply fact-intensive inquiry," and courts therefore hesitate to dismiss claims for failure to plead a relevant product market, Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001), doing so "only if the alleged market makes no economic sense under any set of facts." Flash Elecs., 312 F. Supp. 2d at 391 (citation omitted). In order to survive dismissal, the plaintiff's market definition "must bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes -- analysis of the interchangeability of use or the cross-elasticity of demand,' and it must be 'plausible.'" Todd, 275 F.3d at 199-200 (citations omitted).  Under this methodology, courts look to whether "consumers will change their consumption of one product in response to a price change in another" -- that is, where a customer will substitute a product from another market when the price rises for the products in the proposed market, that proposed market is not properly defined. See Flash Elecs., 312 F. Supp. 2d at 390-391.

The relevant market here is the "wholesale distribution market for sell-through traditional retail magazines in the United States" (the "wholesale retail magazine market"). As noted above, magazines make their way from publishers to traditional retailers -- such as major retail chains, drug stores, and traditional newsstands -- via a network of national distributors and wholesalers. Magazines are not sold directly by publishers to retailers, but are instead distributed, through national distributors, to wholesalers, who in turn sell them to retailers. Retailers *must* utilize this wholesale market in order to obtain products, and there is therefore no "interchangeability of use." If prices were to rise in the wholesale retail magazine market -- as is happening now as a result of defendants' illegal conduct -- retailers will not, and indeed cannot, substitute goods.

A nearly identical market definition was recently upheld in a similar case. In Flash Elecs, where the plaintiff, a wholesale distributor of videos and DVDs, alleged that one of its suppliers and two of its competitors conspired to cut off the plaintiff from the supplier's product through the use of exclusive distribution arrangements, the court described the relevant market as "the wholesale distribution market for 'sell-through' and rental movie videos and DVDs in the United States." 312 F. Supp. 2d at 392. The court agreed with the plaintiffs that video retailers -- just like the traditional magazine retailers here -- use wholesale distribution because it saves time and expense, and retailers "would not respond to an increase in the prices charged by wholesale distributors by switching to direct dealing with the studios." Id. at 392-93. There is even less interchangeability in the market here than in Flash Elecs. -- not only do publishers not deal directly with retailers, selling magazines to retailers *only* via the wholesale chain, but some of the nation's major publishers *conspired to restrict competition and are defendants in this action*. If an American retailer wishes to sell magazines to its customers, it has no choice but to purchase them through the wholesale retail magazine market -- a market that, should the

defendants' conduct continue, will contain only two wholesalers with a dangerous degree of market power, which they have already started using to adversely affect competition in the marketplace.

### ii.   Adverse Effects On Competition

"To state a claim for a rule of reason violation under Section 1, a plaintiff must also allege that 'the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'" Flash, 312 F. Supp. 2d at 393 (quoting Tops Markets, Inc. v. Quality Markets. Inc., 142 F.3d 90, 96 (2d Cir. 1998)). See also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2nd Cir. 1993) ("Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors"). There are generally two ways in which a plaintiff can show an "an adverse effect on competition": (1) by showing "an actual adverse effect on competition, such as reduced output;" or (2) by "indirectly" demonstrating an adverse effect "by establishing that [defendant] had sufficient market power to cause an adverse effect on competition." Tops Markets, 142 F.3d at 96. Defendants' conspiracy has resulted in substantial adverse effects on competition -- reduced output is reaching retailers, who are also being forced to pay higher prices. And the wholesaler defendants are in the process of obtaining -- and without injunctive relief, will *undoubtedly* obtain -- sufficient market power to adversely affect competition.

### 1.   Actual Adverse Effects on Competition

An actual adverse effect on competition may take the form of "reduced output," Tops Markets, 142 F.3d at 96, or increased prices, see Flash, 312 F. Supp. 2d at 394 (plaintiff successfully alleged actual adverse effects, since retailers were paying increased prices to

wholesalers for videos).  Here, there exists both.  First, the defendants' boycott of Source and Anderson has removed from operation a substantial portion of two of the four significant participants in the wholesale market from operation.  As a foreseeable result, retailers are receiving fewer magazines -- which means, in turn, that the retailers' customers have access to fewer magazines as well.  (See Mays Aff. Exh. J. ("We can expect to see a dip in sale[s] as the business transitions over to new sources").)  Moreover, the loss in sales that will inevitably result from the output decline has a dangerous probability of eliminating some smaller publishers, who are already suffering from an adverse economic climate, from the marketplace.  This will *permanently* reduce the choices available to consumers, and correspondingly benefit the remaining publishers in the marketplace -- including, of course, the publisher defendants.  This is undoubtedly an "actual" adverse effect.  See Full Draw, 182 F.3d at 751 (plaintiff properly alleged anti-competitive effect since, due to defendants' successful boycott, "the loss of competition through the elimination of [the defendant's sole competitor] and the resultant loss in . . . output" reduced choice for suppliers and consumers of plaintiff's product).

Moreover, the defendants' scheme has already succeeded in enabling them to charge higher prices.  The wholesaler defendants have already begun to serve retailers previously served by Anderson, and, when signing agreements with those retailers, have negotiated higher rates for "[a]bout 80%" of the new business.  (See Mays Aff. Exh. J (stating that News Group has been re-signing Anderson's business "at a more favorable rate").)  In one instance, for example, News Group has been able to reduce the cover-price discounts received by a retailer, Kroger, from 27% to 26% -- a 1.37% price increase[5] for the exact same products Kroger was receiving through Anderson, made possible solely by defendants' conspiracy.  This alone satisfies plaintiffs'

---

[5]       Since a cover-price discount is subtracted from the cover price to obtain the rate paid by retailers, Kroger now pays 74% of the cover price, whereas they previously paid 73%.  The price increase, 1% of the cover price, divided by the rate, 73% of the cover price, equals 1.37%.

burden of showing an "actual" adverse effect on competition. See Flash, 312 F. Supp. 2d at 394 ("plaintiffs have indeed alleged an actual injury to interbrand competition" where their complaint alleged that "'the price affect [sic] that the defendants' actions have and will have on the video and DVD industry is corroborated by numerous video retailers, . . . who have acknowledged the detrimental affect [sic] on market prices resulting from the fact that the [exclusive distribution agreements] ha[ve] made the industry non-competitive.'"). And at the same time, the defendants' conduct has allowed them to coerce retailers into abandoning their plans to implement more efficient practices such as scan-based trading ("SBT"). (See Mays Aff. Exh. J ("Paradies [a retailer] had recently begun moving all its business to [Anderson] with the promise of scan based trading; in the newly-signed business with News Group, Paradies is no longer looking for SBT. *So the relationships are better.*") (emphasis added).)

### 2.   Market Power

Market power "has been defined as 'the ability to raise price significantly above the competitive level without losing all of one's business.'" K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995) (citation omitted). "Market share may be used as a proxy for market power." Id. A plaintiff may show an actual adverse competitive effect by showing the existence of market power, combined with "grounds to believe that the defendant's behavior will harm competition market-wide, such as the inherently anti-competitive nature of defendant's behavior or the structure of the interbrand market." Id. at 127. In Flash, for example, the conspiring wholesalers "combined to a significant market share of 75% of the wholesale video and DVD distribution market, *indicating substantial market power.*" 312 F. Supp. 2d at 395 (emphasis added).

Here, with the impending exit of Source and the exit of Anderson, Hudson and News Group are on the brink of obtaining a combined market share of *more than 90%* of the wholesale

magazine retail market.  Just as with the defendants in <u>Flash</u>, they "stand to gain an ascendent position in the wholesale video distribution market by virtue of their exclusive right to sell [the magazines published and distributed by defendants].  Thus, the structure of the interbrand market for wholesale [magazines] may indeed be such that intrabrand competition is necessary to avert market-wide anti-competitive effects."  <u>Id.</u>; <u>see also Toledo</u>, 530 F.3d at 220 (denying summary judgment under rule of reason for Section 1 claim alleging vertical conspiracy between manufacturer and distributors because the manufacturer had significant market power).  In <u>Flash</u>, the wholesalers conspired with just one supplier, Universal Studios.  The anti-competitive effect in cases such as <u>Flash</u> is even more significant where, as here, ***multiple*** suppliers refuse to supply to a distributor.  See <u>Reading</u>, 317 F. Supp. 2d at 321 (when multiple movie studios refused to supply plaintiff-exhibitioner with top commercial films (through exclusive distribution agreements with other conspiring exhibitioners), plaintiffs adequately alleged that this had led to "lower revenues for [plaintiff], higher box office and concession prices for consumers, reduction in discounts, and restricted output in [top commercial films].")

**B.    Source Has Demonstrated a Clear Showing of**
**Likelihood Of Success On The Merits Of Its Defamation Claims**

Under Florida law,[6] "defamation encompasses both libel and slander and has been defined as 'the unprivileged publication of false statements which naturally and proximately result in injury to another.'"  <u>Ibp, Inc. v. Hady Enters.</u>, 267 F. Supp. 2d 1148, 1163 (N.D. Fla. 2002) (quoting <u>Byrd v. Hustler Magazine, Inc.</u>, 433 So. 2d 593, 595 (Fla. 4th Dist. Ct. App. 1983)).  To succeed on a claim of defamation, a "plaintiff must allege that: (1) defendant published a false statement, (2) that the statement was communicated to a third party, and, (3)

---

[6]        Because plaintiff is domiciled in Florida, Florida law governs plaintiff's defamation claims.  See <u>Lee v. Bankers Trust Co.</u>, 166 F.3d 540, 545 (2d Cir. 1999) ("Under New York choice-of-law rules in defamation cases 'the state of the plaintiff's domicile will usually have the most significant relationship to the case,' and its law will therefore govern") (citation omitted).

that the plaintiff suffered damages as a result of the publication." <u>Nautica Int'l v. Intermarine</u>

<u>USA, L.P.</u>, 5 F. Supp. 2d 1333, 1344 (S.D. Fla. 1998).

Some statements are defamatory per se; such statements "are injurious on their face and

do not require the aid of extrinsic proof." <u>Ibp</u>, 267 F. Supp. 2d at 1164.  Thus, per se defamatory

statements "'necessarily import general damages and need not be pleaded or proved but are

conclusively presumed to result.'" <u>Army Aviation Heritage Found. & Museum, Inc. v. Buis</u>, 504

F. Supp. 2d 1254, 1259 (N.D. Fla. 2007) (citation omitted).  "A false and unprivileged

publication which injures a corporation, prejudices its ability to conduct its trade or business,

deters third persons from dealing with it, assails its management, or impugns its method of doing

business is actionable per se." <u>Id.</u>; <u>see also</u> <u>McIver v. Tallahassee Democrat, Inc.</u>, 489 So. 2d

793 (Fla. Dist. Ct. App. 1st Dist. 1986) (libel action may lie where statement "inflicts injury on

[a corporation's] credit or business").  Thus, where a defendant has told third parties that a

plaintiff "'ha[s] failed and gone into bankruptcy,'" a court will find that defendant liable for

defamation per se.  <u>See</u> <u>Wolkowsky v. Garfunkel</u>, 65 Fla. 10, 11 (Fla. 1913).

Here, defendants have published a variety of false statements to third parties regarding

Source:

- In a letter distributed to Source's retailers on February 2, 2009, TWR stated that "SID [*i.e.*, Source] owes TWR tens of millions of dollars in outstanding payments including recent, unsubstantiated deductions.  The fee request coupled with the outstanding payment issues has forced us to seek alternative methods of distribution for Time Inc. products.  SID has failed to pay TWR for magazines that you have already paid SID for and sold to your customers. . . . It is precisely because of this sort of behavior that TWR has decided that it is no longer willing to bear the credit risk relating to SID." (Mays Aff. Exh. E.)

- In a letter distributed to Source's retailers on February 5, 2009, TWR stated that "Source has continued with a pattern of behavior that includes withholding payments, taking unauthorized deductions and claiming illegitimate returns." (Mays Aff. Exh. I.)

- In the same letter, TWR stated that "I know you would not allow customers to come into your stores and buy products at whatever prices they felt like paying. That is what Source . . . ha[s] tried, unsuccessfully, to do here." (Id.)

- TWR also stated that Source and Anderson had "put a gun to our head" through the "sudden and simultaneous imposition of a $.07 per copy fee," and that Source was an "unreliable wholesaler[ ]," which failed to pay its bills. (Id.)

These statements are patently and demonstrably false. Source does not owe TWR "millions of dollars in outstanding payments," and has not taken "unsubstantiated" or "unauthorized" deductions or claimed "illegitimate" returns. Source's actions are expressly contemplated by a term sheet informally agreed upon by the parties in December of 2005. These statements are not only untrue, their untruth was known at the time they were disseminated. And in any case, their lack of veracity was easily ascertainable -- at best, defendants acted with a reckless disregard for the truth.

Defendants' derogatory statements impugning Source's creditworthiness constitute defamation per se. TWR's statements plainly "prejudice[] [Source's] ability to conduct its trade or business." Army Aviation, 504 F. Supp. 2d at 1259. This was fully intentional -- in fact, in a prior letter, TWR specifically advised Source's retail customers not to deal with Source. (Mays Aff. Exh. D.) And TWR's statements clearly implicate Source's creditworthiness -- TWR admitted as much when it stated that it was "precisely because of this sort of behavior [i.e. the 'unsubstantiated' deductions] that TWR has decided that it is no longer willing to bear the credit risk relating to SID . . ." (Mays Aff. Exh. E.) In fact, it is "precisely" this type of statement that is per se defamatory under well-established law. See Army Aviation, 504 F. Supp. 2d at 1259.[7]

---

[7]    Notably, even if New York law governed, defendants would still be liable for defamation per se. See Croton Watch Co. v. Nat'l Jeweler Magazine, Inc., 06 CV 662 (GBD), 2006 U.S. Dist. LEXIS 55753, at *12-13 (S.D.N.Y. Aug. 7, 2006) ("With regard to business entities, statements which impugn the basic integrity, creditworthiness, or competence of the business are defamatory per se. Statements have been found to be defamatory per se where they indicate the company is insolvent . . .") (citations omitted).

Accordingly, Source has demonstrated a clear and substantial likelihood of success on --

much less, sufficiently serious questions going to -- the merits of its defamation claim.

**C.     Source Has Demonstrated a Clear Showing of Likelihood
of Success on the Merits of Its Tortious Interference Claims**

Defendants here have engaged in collusive activities for the sole purpose of forcing

Source out of the magazine wholesale market. In addition to their coordinated refusal to deliver

magazine product to Source, defendants have made false statements regarding Source's financial

status and continued existence as a magazine wholesaler to Source's retailer customer base.

Defendants' false statements were made in an attempt to frustrate the business relationships and

contractual agreements that Source maintains with the retailers it serves. Not surprisingly,

defendants' false statements have severely damaged the business relationships between Source

and its retailer customers, and have caused significant injury to Source. Therefore, defendants'

actions constitute tortious interference under Florida law.[8]

Under Florida law, the elements of tortious interference are: (1) the existence of a

business relationship, even if not evinced in a formal written agreement; (2) the defendant knew

of the relationship; (3) the defendant intentionally and unjustifiably interfered with the

relationship; and (4) damage to Source as a result of the breach of the relationship. See Ethan

Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812, 814 (Fla. 1994). In this case, all

requisite elements have been satisfied, and preliminary injunctive relief is warranted. See

Heavener, Ogier Servs. v. R. W. Fla. Region, 418 So. 2d 1074, 1075 (Fla. Dist. Ct. App. 5th

---

[8]     New York courts have determined there is an actual conflict between the laws of New York and Florida
with respect to claims of tortious interference. Keehfus Ltd. P'ship v. Fromkin Energy, LLC, 1:06-CV-987
(GLS\DRH), 2007 U.S. Dist. LEXIS 62319, at *7-10 (N.D.N.Y Aug. 23, 2007). There, applying an interest-
analysis test, the court determined that tortious interference falls into the category of torts governing the appropriate
standards of conduct, and as such, the law of the jurisdiction where the tort occurred will apply. Id. at *9-10. In this
case, plaintiffs' injuries were sustained in Florida, therefore, Florida law will govern plaintiffs' tortious interference
claims.

Dist. 1982) ("Temporary injunctions have been recognized as a viable form of relief in a suit for tortious interference with a contract.")

### 1.   A Business and Contractual Relationship Existed Between Source and Its Retailer Customers

Source's claim for tortious interference must be based on a relationship that "afford[s] [Source] existing or prospective legal or contractual rights." Register v. Pierce, 530 So. 2d 990, 993 (Fla. Dist. Ct. App. 1st Dist. 1988), review denied, 537 So. 2d 569 (Fla. 1988). "The test is whether there was 'an understanding between the parties [which] would have been completed had the defendant not interfered.'" Ethan Allen, 647 So. 2d at 814. Source's claims satisfy this test. Source, as a wholesaler in the magazine industry, has established a network of relationships with multiple retailers all across the country, such as Rite Aid, Supervalu, Kroger and others, through which it distributes magazines. Source has maintained these business relationships, distributing magazines to these retailers and servicing their retail outlets, for years. Were it not for defendants' anti-competitive, defamatory conduct, these retailers would have continued to order magazines from Source. See Ruskin Co. v. Greenheck Fan Corp., No. 08-CV-60902, 2008 U.S. Dist. LEXIS 94993, at *6-7 (S.D. Fla. Nov. 13, 2008) (where plaintiff had 20-year profitable relationship with distributor, which it expected to continue until the interference, plaintiff "has alleged the existence of a sufficient business relationship.")

### 2.   Defendants Knew of the Existing Business Relationships and Contractual Agreements Between Source and Its Retail Customers

In order to tortiously interfere with an existing business relationship, a defendant must know of its existence. See Ethan Allen, 647 So. 2d at 814. It is indisputable that defendants knew of the existing relationships between Source and its respective retailers. Indeed, TWR was obviously keenly aware of such relationships when it wrote many of these retailers "to inform" them that TWR had ceased shipping product through Source; it was in this letter that TWR made

some of its defamatory statements regarding Source.  (See Mays Aff. Exh. E ("SID owes TWR

tens of millions of dollars . . .").)

### 3. Defendants Intentionally and Unjustifiably Interfered With Source's Relationships With Its Retail Customers

Defendants clearly intended to interfere with Source's existing and prospective

relationships with retailers.  Indeed this interference was absolutely necessary to their conspiracy

to take over the wholesale magazine market -- if Source were able to maintain these

relationships, News Group and Hudson would not have been able to take over Source's territory,

and defendants' anti-competitive scheme would fail.  Moreover, defendants' interference was

unjustifiable.  See Salit v. Ruden, 742 So. 2d 381, 385 (Fla. Dist. Ct. App. 4th Dist. 1999)

(reversing dismissal of tortious interference claims where defendants made "false accusations"

concerning a corporate officer knowing that the accusations were false, and "as a result the board

terminated [his] contract").

Notably, even where the retailers had the right to exit the relationship without breaching

any agreement with Source, defendants' "direct and unjustified" interference constitutes tortious

interference.  See Ferris v. S. Fla. Stadium Corp., 926 So. 2d 399, 402 (Fla. Dist. Ct. App. 3d

Dist. 2006) ("where interference with an at will relationship is direct and unjustified[,] such

interference is actionable"); Ahern v. Boeing Co., 701 F.2d 142, 144 (11th Cir. 1983) ("Florida

courts have determined that 'an action will lie where a party tortiously interferes with a contract

terminable at will'") (quoting Unistar Corp. v. Child, 415 So. 2d 733, 734 (Fla. Dist. Ct. App. 3d

Dist. 1982)).  That is, "where the plaintiff shows 'an intentional and unjustified interference with

an existing business relationship which causes damage to the plaintiff,' a prima facie case is

established, and the burden then shifts to the defendant to justify its actions." Ahern, 701 F.2d at

144 (citation omitted).  When a contract is terminable at will, for example, the defendant has the

burden of proving that it has a privilege; one such privilege exists where the defendant's "interference was *lawful* competition." Unistar, 415 So. 2d at 734 (emphasis added); see also Metzler v. Bear Auto. Serv. Equip. Co., SPX, 19 F. Supp. 2d 1345, 1364 (S.D. Fla. 1998) ("Lawful competitive practices are privileged under Florida tortious interference law. As long as no improper means are employed, business activities taken to safeguard or promote one's own financial interests are not actionable") (citation omitted). As has been fully demonstrated above, see Section III.A., *supra*, defendants' interference was anything but lawful. See, e.g., Metzler, 19 F. Supp. 2d at 1364 ("antitrust law provides [the] best barometer of whether alleged anti-competitive behavior can be found 'wrongful' and hence tortious under state law") (citation omitted).

### 4.   Defendants Have Suffered, and Continue to Suffer, Significant Damage as a Result of Defendants' Conduct.

As a result of defendants' interference, retailers that would have otherwise continued to accept magazines distributed by Source have been forced to end their relationships with Source and seek other suppliers. (See Mays Aff. Exh. K ("Should SID fail to deliver Time Warner Retail and DSI magazines, Supervalu will have no choice but to seek these titles elsewhere . . .").) In addition to the lost profits that Source is presently suffering as a result of the loss of these relationships, there will also be irreversible and significant future harm -- once retailers have entered into relationships with different wholesalers, any chance of them re-entering a profitable relationship with Source in the future will be substantially diminished. As a result, Source has no adequate remedy at law and injunctive relief is warranted.

Accordingly, Source has demonstrated a clear and substantial likelihood of success on -- much less, sufficiently serious questions going to -- the merits of its tortious interference claim.

## IV.   THE BALANCE OF HARDSHIPS
## OVERWHELMINGLY TIPS IN PLAINTIFFS' FAVOR

Because plaintiffs have demonstrated more than a likelihood of success on the merits, the Court need not balance the hardships in order to grant plaintiffs the injunctive relief they seeks. In any event, however, the balance of hardships overwhelmingly tips in plaintiffs' favor.

As Source has shown, in the absence of an injunction, it would suffer irreparable harm for which money damages could not adequately compensate it. Defendants' ongoing, unjustifiable refusal to provide a product that is essential to Source's business, along with their continued disparagement of Source in the marketplace, will cause Source the immediate and irreparable harm of undermining its good will and business relationships with retailers and destroying its ability to continue as a going concern. The resultant injuries of this calculated, unlawful wrongdoing would include the destruction of Source's business, the dismissal of thousands of employees, and the privation of certain of its customers. Under these circumstances, the balance of hardships tips decisively in favor of granting plaintiffs injunctive relief. See, e.g., Aim Int'l Trading L.L.C. v. Valcucine, No. 02 Civ. 1363 (PKL), 2002 U.S. Dist. LEXIS 10373 at *18-19 (S.D.N.Y. June 11, 2002) (balance of hardships favored grant of injunctive relief to plaintiff distributor where denial of relief would have forced distributor out of business); Holzer Watch, Inc. v. Montres Universal, S.A., No. 93 Civ 6133 (RPP), 1993 U.S. Dist. LEXIS 16311 at *5-6 (S.D.N.Y. Nov. 18, 1993) (same).

In stark contrast, defendants will suffer little, if any harm. Defendants will suffer no loss -- and certainly no legitimate loss -- if they continue to deal with Source. The distribution network for the delivery of single-issue magazines will continue to operate, the publishers, distributors and wholesalers will continue to be paid for the sale of magazines, and the retailers will continue to receive the product they depend on. Defendants will simply continue with the

course of dealing they were accustomed to before they conspired to expel Source from the wholesale marketplace.  The only injury that defendants will suffer is that which arises from being compelled to sell to a distributor against their will.  The court in <u>Jacobson & Co.,</u> found this type of forced dealing to be "insignificant."  548 F.2d at 445.

41

## V.   **CONCLUSION**

For the foregoing reasons, an injunction should be issued enjoining defendants from

boycotting Source as a wholesaler of defendants' magazines and otherwise attacking plaintiffs

and their businesses.


Dated: New York, New York
       February 9, 2009

Respectfully submitted,

KASOWITZ, BENSON, TORRES &
  FRIEDMAN LLP

By: _____
    Marc E. Kasowitz (mkasowitz@kasowitz.com)
    Daniel R. Benson (dbenson@kasowitz.com)
    Hector Torres (htorres@kasowitz.com)
    Maria Gorecki (mgorecki@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Plaintiffs
Source Interlink Distribution, L.L.C.
and Source Interlink Companies, Inc.*