Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Maria Gorecki (mgorecki@kasowitz.com)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel.:   (212) 506-1700
Fax:   (212) 506-1800

Attorneys for Plaintiffs Source Interlink Distribution L.L.C.
 and Source Interlink Companies, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x
SOURCE INTERLINK DISTRIBUTION, L.L.C. and    :
SOURCE INTERLINK COMPANIES, INC.,            :
                                             :
                    Plaintiffs,              :      09 CIV. 1152 (PAC)
                                             :
              - against -                    :      JURY TRIAL DEMANDED
                                             :
                                             :
BAUER PUBLISHING CO., LP., MR CONSULTING     :
SERVICES LLC, and MICHAEL R. ROSCOE,         :
                                             :
                    Defendants.              :
-------------------------------------------------------------------- x


**SECOND AMENDED COMPLAINT**

Plaintiffs Source Interlink Distribution L.L.C. ("Source") and Source Interlink Companies, Inc. ("Source Interlink"), for their Second Amended Complaint against defendants Bauer Publishing Co., L.P. ("Bauer"), MR Consulting Services LLC ("MR Consulting"), and Michael R. Roscoe ("Roscoe"), upon knowledge as to themselves and otherwise upon information and belief, allege as follows:

## Preliminary Statement

1.     In this action, Source, a wholesaler of magazines to leading mass-merchandise retailers, bookstore chains, grocery stores and other retail outlets, and its parent, Source Interlink, seek monetary damages and a permanent injunction, among other relief, to enjoin defendants from continuing their collusive anti-competitive scheme -- in clear violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the common law -- to attack, disparage and destroy Source's business.

2.     Permanent injunctive relief is necessary to prevent the irreparable harm -- the destruction of Source's business and the monopolization of the United States wholesale magazine distribution market -- that the misconduct of defendants, a major magazine publisher and a magazine distribution industry consultant, and their co-conspirators, other publishers, their national distributors, and at least one of the four major wholesalers in the United States, if not restrained, will doubtless cause.

3.     Defendants and their co-conspirators, as described below, in furtherance of their scheme:  cut off Source from some of the nation's most popular magazines; attempted to force Source to sell its business infrastructure -- including its trucking fleet, distribution equipment and distribution centers -- to its wholesale competitors at below-market prices; spread

disparaging rumors about Source and its financial condition to its customers, employees and others in the industry; encouraged Source's customers to cease doing business with it through, among other things, such false rumors; and raided Source's employees and sought to steal the intellectual property that those employees used to run Source's business.

4.    If defendants' schemes are not stopped, Source's entire business, including its good will, reputation, 8,000-employee work force and customer base, will be destroyed. Indeed, defendants already have succeeded in destroying Anderson, the only other major non-colluding wholesaler in the market, by also cutting it off from all supplies of the publishers' magazines. Anderson announced on February 7, 2009 that it had no recourse but to suspend normal business activities and shortly thereafter was driven out of business completely.

5.    Defendants' indisputable goal is to destroy Source's business so that Bauer and its co-conspirators -- through Hudson and News Group, the two remaining major wholesalers -- will monopolize the wholesale market and use that monopoly power to shift to retailers and consumers -- and away from publishers -- the entire financial burden resulting from worsening market conditions and publisher-imposed inefficiencies in the distribution system.

6.    Absent intervention by this Court enjoining defendants from continuing to engage in their collusive anti-competitive and tortious conduct, the harm both to competition in this market and to Source's distribution business, goodwill, reputation and customer base will be irreparable. Moreover, defendants' unlawful conduct already has resulted in millions of dollars in damages to Source.

## THE PARTIES AND OTHER MEMBERS OF THE CONSPIRACY

**A.**   **Publishers**

7.   Defendant Bauer, a Delaware partnership with its principal place of business in Englewood Cliffs, New Jersey, is the publisher of magazines such as *In Touch Weekly*, *Life & Style Weekly*, *Woman's World*, *First For Women* and *Soaps In Depth*.

8.   Hachette Filipacchi Media, U.S. ("Hachette"), a Delaware corporation with its principal place of business in New York, New York, is the publisher of *Car and Driver*, *Road & Track*, *ELLE*, *ELLEGirl*, *ELLE Décor*, *HOME*, *Metropolitan Home*, *Woman's Day*, *American Photo*, *Boating*, *Cycle World*, *Popular Photography* and *Sound & Vision*.

9.   Rodale, Inc. ("Rodale"), a Pennsylvania corporation with its principal place of business in Emmaus, Pennsylvania, is the publisher of *Men's Health, Prevention, Women's Health, Runner's World, Best Life, Bicycling, Running Times, Organic Gardening,* and *Mountain Bike*.

10.   American Media, Inc. ("AMI"), a Delaware corporation with its principal place of business in Boca Raton, Florida, the fourth largest consumer magazine publisher, and the second largest publisher in retail magazine sales, in the United States, publishes 16 titles, including 6 of the top 15 best selling weekly newsstand magazines.  Its publications include *Country Weekly, FLEX, GLOBE, Men's Fitness, MUSCLE & FITNESS, National Enquirer, SHAPE*, and *Star*.

11.   Time Inc. ("Time"), a Delaware corporation with its principal place of business in New York, New York, the parent corporation of Time/Warner Retail Sales & Marketing Inc., is the largest magazine publisher in the United States and publishes more than 120 magazines,

4

including *Time*, *People*, *Entertainment Weekly*, *Sports Illustrated*, *Essence*, *Fortune*, *Gold*, *In Style*, *Money*, *People en Espanol*, *Real Simple*, *Sports Illustrated for Kids*, *This Old House*, *Coastal Living*, *Cooking Light*, *Health*, *Southern Accents*, *Business 2.0*, and *Southern Living*.

**B.   National Distributors**

12.   National magazine distributors are used by magazine publishers to provide marketing and billing services to publishers.  As discussed below, the national distributors also are used as a vehicle for facilitating collective conduct among publishers.

13.   Curtis Circulation Company ("Curtis"), a Delaware corporation with its principal place of business in Pennsauken, New Jersey, is a national distributor of hundreds of different titles for at least 400 publishers, including its affiliate, Hachette, as well as publishers Rodale, AMI, The Economist Group, Forbes, Newsweek, The Atlantic Monthly, Timeout, and US News & World Report, among others.  Publications distributed by Curtis include *Woman's Day*, *Car & Driver*, *Newsweek*, *Men's Health*, *Maxim*, *Elle*, and *The Economist*.

14.   Kable Distribution Services, Inc. ("Kable"), a Delaware corporation with its executive offices in New York, New York, is a national magazine distributor that distributes more than 650 magazines, annuals and digests for over 250 different publishers, including defendant publisher Bauer, as well as All American Crafts, Inc., Amos Publications, Archie Comics, Bowtie Incorporated, Niche Media Holdings LLC, and Nielsen Business Media. Publications distributed by Kable include *In Touch*, *Woman World*, *First for Women*, *Tiger Beat*, and *WWE Magazine*.

15.   Time/Warner Retail Sales & Marketing Inc. ("TWR"), a New York corporation with its principal place of business in Parsippany, New Jersey, and an office in New York,

5

New York, is a national magazine distributor, whose publishing clients include its parent, Time.

### C.    Magazine Wholesalers

16.    There are three major wholesalers, now that Anderson has been driven out of business, who sell to retail outlets magazines for single-copy sales at such outlets.

17.    Plaintiff Source, a Delaware corporation with its principal place of business in Bonita Springs, Florida, is a major magazine wholesaler, and is the leading wholesaler in five of the nation's top ten advertising markets.  Plaintiff Source Interlink is Source's parent company.

18.    Hudson News Distributors LLC ("Hudson"), a New Jersey limited liability company with its principal place of business in North Bergen, New Jersey, is a major magazine wholesaler.

19.    The News Group, L.P. ("News Group"), a Delaware limited partnership with its principal place of business in Texas, is a major magazine wholesaler.

### D.    Other Members of the Conspiracy

20.    Defendant MR Consulting, a Florida limited liability company with its principal place of business in Palm Beach Gardens, Florida, is engaged in consulting clients in the magazine distribution industry.

21.    Defendant Michael R. Roscoe, a former employee of Distribution Services, Inc. ("DSI") and the owner and principal employee of defendant MR Consulting, resides at 23 Dunbar Road, Palm Beach Gardens, Florida  33418.

22.    DSI, a Delaware corporation with its principal place of business in Delray Beach, Florida, is a subsidiary of AMI and a provider of marketing services to publishers, including AMI, Bauer, Hachette, and Rodale.

## JURISDICTION AND VENUE

23.    This action is brought to obtain injunctive relief and to recover damages caused by defendants' violation of, among other things, Section 1 of the Sherman Act, 15 U.S.C. § 1.

24.    The Court has subject matter jurisdiction over this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26; 28 U.S.C. § 1337, and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

25.    Venue is proper in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, because defendants transact business and are found within this district, and a substantial part of the events giving rise to plaintiffs' claims occurred within this district.

## BACKGROUND

**A.    Overview:  Single-Copy Magazine Sales**

26.    The major United States magazine publishers, which publish the magazines and set their cover prices, include defendant Bauer, as well as Hachette, Rodale, AMI and Time. To effectuate single-copy magazine sales (*i.e.*, non-subscription sales), each publisher retains a national distributor, which serves as a broker to manage the publisher's relationship with its wholesalers, provides marketing and accounting services to the publisher and guarantees the wholesaler's payment obligations to the publisher.  Those national distributors, however, also

are used by the publishers to facilitate collusive communications and conduct among the publishers.

27.   The four U.S. national distributors are Curtis, TWR, Kable and Comag Marketing Group LLC ("CMG").  The national distributors are compensated with a percentage, typically two to five percent of the retail sales value of the magazines they handle.  DSI, a subsidiary of AMI, provides sales and marketing services to publishers, and facilitated collusive communications and conduct among publishers and national distributors.

28.   Pursuant to allotment orders provided by the national distributors (which typically greatly exceed the number ultimately purchased by consumers), the publishers' magazines are shipped from the printers to wholesalers, who in turn, ship the magazines to retailers, including traditional mass merchandisers and grocery store chains, such as Wal-Mart and Kroger, as well as newsstands, convenience stores, airport terminals and other retail outlets, and specialty retailers like Barnes & Noble and Borders.

29.   Wholesalers are responsible for picking up, tabulating and destroying copies of magazines that remain unsold.  Wholesalers buy the magazines from the publishers at a price of 50 to 60 percent of the cover price and sell to the retailers at a price of 70 to 75 percent of the cover price.  Before defendants' conspiracy drove Anderson out of business, the market shares of the four wholesalers broke down approximately as follows:  Source 31%, Anderson 27%, Hudson 11% and News Group 21%.

**B.      Publisher-Imposed Inefficiencies in Traditional Distribution System**

30.   The distribution system is plagued by gross publisher-imposed inefficiencies that have resulted in onerous and unnecessary costs for wholesalers.  For example, publishers and

national distributors customarily ship to wholesalers three times the number of magazines sold by the retailers. Wholesalers are forced to absorb the full cost of tabulating the unsold copies and transporting them back to their own facilities for disposal or destruction.

31.    A different system for distribution has been proposed, known as "scan-based trading," under which the retailers automatically would report sales of magazines through electronic check-out scanners and then dispose of unsold copies.

32.    The publishers, however, adamantly oppose scan-based trading, because they supposedly would not be paid for, nor would their circulation numbers reflect, "shrinkage" -- *i.e.*, sales that are not scanned as a result of machine error. Certain sources claim that shrinkage accounts for approximately five percent of all sales.

33.    In addition to shipping excessive magazine copies, publishers and national distributors ship large numbers of unprofitable magazine titles, forcing the wholesaler to bear unnecessary costs of handling and returns. Publishers and national distributors likewise have resisted efforts to curtail their ability to ship unprofitable titles.

C.     **Source and Its Efforts to Remain Competitive**

34.    Source Interlink, which was founded in 1995 and has approximately 8,000 employees, commenced its business, which it conducts through Source, as a magazine wholesaler in 2001. In the traditional market, Source's operations are focused in 25 states

throughout the West Coast, the mid-Atlantic and the mid-western Rust Belt. Source has been engaged in business with Bauer and its co-conspirators since 2001.[1]

35.    During the past five years, Source has invested heavily in distribution equipment, wholesaling centers, technology, logistics and software. The company also has sought to address with publishers and national distributors the unnecessary and burdensome costs caused by their excessive supply and unprofitable titles.

36.    On or about January 14 of this year, one of Source's wholesaler competitors, Anderson, announced that it would impose an additional $.07 per copy distribution fee for all magazine copies received, and would pass on to the publishers the carrying costs of inventory in retail chains where it had negotiated scan-based trading terms. Before that announcement, Source had been conducting a title-by-title profitability study. After Anderson issued its surcharge announcement, Source decided to issue an announcement stating that Source would impose a similar per copy distribution fee because this was an expeditious way to begin to address the cost challenges in this business. Source expected to continue to work with the publishers and national distributors to address fully the cost issues. Accordingly, Source announced a $.07 surcharge to be effective February 1, 2009, by a letter of January 19, 2009.

37.    The publishers and national distributors resisted the surcharge. As a result, shortly after Source's January 19th announcement, Source rescinded the surcharge, and all the publishers and national distributors (except one) told Source that they would continue to supply

---

[1]       Source Interlink, through its subsidiary Source Interlink Media ("SIM"), is also a publisher of popular magazines. In 2007, Source Interlink acquired more than 75 consumer magazines, 90 related Web sites, more than 65 events, television and radio programs, and approximately 400 branded products from Primedia Inc. SIM is a leading special-interest magazine publisher in the United States, with well-known brands such as *Motor Trend*, *Automobile*, *Snowboarder* and *Soap Opera Digest*.

Source with magazines and discuss with Source alternative approaches for addressing the disproportionate cost burden imposed by excessive supply and unprofitable titles.

38.    Thus, during the week of January 26, 2009, Alan Tuchman, Source's President, and Chris Argentieri, Source's Senior Vice President, traveled to New York to meet with the major publishers and national distributors.  On January 27, Tuchman and Argentieri met with Curtis's President and Chief Operating Officer Bob Castardi.  Castardi stated that he would suggest an alternative approach for addressing the profitability issues within the following week, that any agreement would be retroactive to February 1, 2009, and that Curtis would continue to ship magazines to Source.

39.    On January 27, Tuchman and Argentieri also met with Bauer's President and Chief Executive Officer, Hubert Boehle, its Senior Vice President, Rick Parker, and its Executive Vice President Henning Lauer.  Bauer offered to discuss other possibly mutually-beneficial changes, such as helping to fund an expansion into Anderson territory and granting Source exclusivity in stores.

40.    On January 28, Tuchman confirmed to Parker that Source had rescinded the $.07 surcharge, and Parker confirmed that Bauer would grant Source exclusivity in certain retail outlets.

41.    On January 29, Source's Chief Executive Officer, Gregory Mays, spoke with AMI's President, who told Mays that AMI did not have any business or credit issues with Source and assured Mays that AMI would continue to ship magazines to Source.

42.    On January 30, Mays confirmed to AMI's President during a conference call that the $.07 surcharge was not applicable to AMI.  AMI's President stated that, if Curtis was on board -- which it had claimed to be -- AMI would continue to ship magazines to Source, and the parties would discuss the economics later.  Curtis and AMI stated that they would ensure that Bauer (which, notwithstanding the January 28 Tuchman-Parker conversation, had sent a January 30 termination notice) also would continue to supply magazines to Source.

43.    On January 30, during Mays' discussion with Curtis's Castardi and AMI's Pecker, Castardi agreed that Source was "within terms" and that Curtis had no business or accounting issue with Source.  Having heard that AMI would continue to ship magazines to Source and that AMI had no issues with Source, Castardi expressly stated that Curtis -- "of course" -- would continue to ship to Source.   That same day, Source confirmed to AMI the prior understanding and agreed that Source would not charge the $.07 surcharge to Curtis's publishing clients.

44.    On January 31, 2008, Mays had what he believed was a very productive and cordial three-hour meeting with Rich Jacobsen, TWR's CEO, at his office, where Mays confirmed that the $.07 surcharge was rescinded and that Source wanted to continue a positive relationship with TWR.  Jacobsen responded that the "door was still open" and represented that TWR had not entered into any agreements with other wholesalers.  As a demonstration of Source's good faith, Mays agreed that Source would voluntarily make a payment to TWR relating to a disputed matter on Monday, February 2, 2009.  Jacobsen stated that he appreciated that gesture and he and Mays arranged to meet in New York for dinner on Monday, February 2, 2009, to discuss further continuing the relationship.

12

**D.      The Conspiracy to Destroy Source and Steal Source's Business**

45.     Despite the clear assurances to the contrary, Bauer and other publishers and distributors, including AMI, Time, TWR and DSI, moving in virtual lockstep, abruptly and to Mays's shock, cut Source off from its supply of magazines -- including some of the most popular titles, such as *Newsweek, Forbes, In Touch Weekly*, and *Life & Style Weekly*. At the same time, the defendants and their co-conspirators launched a campaign in which certain of them spread false rumors to Source's customers and others that Source was in deep financial trouble and had ceased operations or was exiting the magazine wholesale business. The goal of that coordinated campaign was to do just that -- to put Source out of business. At the same time that Bauer and other distributors and publishers had cut off Source and defendants and their co-conspirators were spreading those lies, Hudson and News Group were seeking to acquire Source's distribution facilities and were stealing Source's employees and the proprietary intellectual property that those employees had used to run Source's business. Simply stated, defendants and their co-conspirators have been attempting to destroy Source, and will ultimately succeed unless the permanent injunctive relief plaintiffs seek is granted.

46.     Thus, for example, on January 27, 2009, TWR refused to supply Source with any Time publications -- 20% of Source's business. And even though Source was essentially current in its obligations to TWR, TWR disseminated an e-mail to all of TWR's publishers stating that TWR no longer would continue to provide the traditional national distributor guarantee, common in the industry, of Source's payment for any products shipped to Source.

47.     On February 2, 2009, TWR distributed to all its "retail partners" a letter further disparaging Source, falsely stating that Source owed TWR tens of millions of dollars in

outstanding payments and for "unsubstantiated deductions." The letter also falsely stated that TWR was forced to stop delivering Time product to Source because of its alleged "ultimatum imposing" an additional fee -- the previously announced $.07 surcharge that Source already had rescinded. False rumors, including that Source was filing for bankruptcy and that it had ceased all operations, also surfaced during this time.

48.   TWR, however, was not acting alone. Defendant Bauer, as well as Curtis, DSI, Kable, Hachette, Rodale, AMI and Time, which together constituted 60% of Source's business, also were attacking Source.

49.   Notwithstanding their assurances to the contrary, on Monday, February 2, 2009, within minutes of Source having made a payment to its national distributors of more than $60 million, Curtis, Bauer and Kable sent letters to Source reneging on their commitment to continue supplying product to Source. In addition, AMI's President called Mays on the afternoon of February 2 and told Mays that AMI would stop supplying product to Source. Mays also learned that -- at the same time that AMI had been representing that it would continue to supply Source, *i.e.*, on January 29, 2009, DSI -- a subsidiary of AMI -- was diverting product intended for Source to Hudson and News Group.

50.   During the call, AMI's President claimed that AMI had no choice because it had to follow the lead of its distributor, Curtis, who also would stop supplying product to Source. Indeed, publisher defendant Bauer -- as well as AMI, Hachette and Rodale -- have contracts with their national distributors that give the distributor discretion to select the wholesalers for distribution of the publishers' magazines. These agreements allowed the publishers to claim, as AMI did, that they "had no choice" but to follow the lead of their distributors. This was an

14

integral part of the conspiracy, as Bauer was able to use distributor Curtis as well as Kable to facilitate collusive communications and conduct.

51.   Moreover, a Source executive was advised by Castardi, the president of Curtis that, on January 31, he (Castardi) knew -- with "100% certainty" -- that TWR, Bauer and AMI would refuse to supply product to Source.  Castardi obviously knew that if he had disclosed the truth to Source on January 31, *i.e.*, that Curtis was acting in concert with the others and they all intended to cut off Source's supply of magazines, Source would not have transferred more than $20 million to Curtis on February 2.

52.   Rick Parker of Bauer, who as recently as January 28, intentionally and falsely had confirmed to Source that Bauer would grant Source exclusivity in certain retail outlets, after Source had agreed to rescind the $.07 surcharge, responded to an e-mail from Bauer's competitor, Rodale, that CMG was "also shipping Source again," responded as follows: "Doesn't matter [S]ource won't be around much longer."  Rodale already had indicated to AMI that Source needed to be driven out of business.

53.   The wholesaler co-conspirators also had been stealing Source's employees.  Thus, on Friday, February 6, wholesaler News Group, which was acting in concert with the other conspirators, began raiding the key employees in Source's Wisconsin, Minnesota, South Dakota, Iowa, Michigan and Chicago territories and, Source believes, stealing the intellectual property used by those employees to run Source's business.  News Group had solicited and recruited several of Source's directors for that region and already has employed two of Source's directors, Dave Deitrich and Jack Foerst.  For example, Deitrich was poised to take more than 100 of Source's other employees from that region.  News Group reportedly had been

attempting to exploit Source's employees' (many of whom are single mothers) fear of unemployment through job offers premised on the condition that the jobs be accepted immediately.

### 1.    Evidence of Conspiracy

54.    This is truly an orchestrated campaign to destroy Source as part of a scheme to eliminate competition among wholesale distributors and to enable the publishers to control this market.  In mid-January, the defendants had already begun their collusive scheme, often communicating through DSI, an affiliate of AMI that ostensibly provided "marketing services" to national distributors Curtis and Kable, and publisher defendant Bauer, as well as Hachette and, of course, AMI.  Indeed, as early as mid-January 2009, on the eve of Anderson's industry-wide announcement of its $.07 surcharge, co-conspirators were discussing plans to redirect business to News Group.

55.    Another, and principal, avenue of unlawful communications among the co-conspirators was defendant Roscoe, a former DSI employee, and his consulting firm, MR Consulting.

56.    Bauer and its co-conspirators proceeded with their conspiracy to cut off supply to Source and Anderson, including, among other things, through coordinated communications with each other and with the targets' customers, and through a coordinated strategy to cut off supply to both Source and Anderson.

57.    Throughout the latter part of January and the early days of February, the defendants and their co-conspirators -- ostensibly each others' competitors -- held various

16

meetings during which they discussed dividing the U.S. distribution territory into two regions
-- one controlled by Hudson and the other controlled by News Group.

58.    Meanwhile, Castardi and Duloc -- the presidents of two of the four national
distributors, purported competitors Curtis and Kable -- met with each other on January 18,
2009.

59.    In furtherance of their conspiracy to cut off supply to Source, Curtis and Hudson
also met with their respective competitors, TWR and News Group, on January 29, 2009, at
Hudson's offices in North Bergen, New Jersey.  Thus, a mere two days after Castardi falsely
represented to Source that Curtis would continue to supply magazines, and only a day before
Castardi confirmed to Source that it was "within terms," and that Curtis "of course" would
continue to ship product to Source, Curtis was meeting with its competitor TWR to divide the
Source magazine supply among Source's competitors.  Two days later, on February 2, 2009,
TWR announced that it had reached agreements with other "wholesale partners."

60.    The conspirators also actively monitored the activities of other members of the
industry to determine if they posed a threat to the conspiracy.  On January 29, Alleger of
Rodale e-mailed Porche of DSI, stating that he had just read an e-mail from CMG to its clients:
"they have reached an understanding with BOTH Anco and Source and will continue to SHIP!
Sullivan [the CEO of CMG] is dangerous."  Porche forwarded the message to AMI's President
-- Rodale's competitor -- who in turn forwarded it to Roscoe, one of the conduits through
which the conspiracy was effectuated.

61.    Both before and after the January 29 meeting of conspirators, the defendants and
their co-conspirators engaged in a concentrated degree of conference calls and other

communications between competitors, spanning all levels of the wholesale magazine distribution market concerning the implementation of their boycott.

62.   In an attempt to conceal their collusive conduct, defendants also used trade association activities as a front for their collusive communications and conduct.  For example, on January 14, 2009, Jerry Lynch, the president of the International Periodical Distributors Association (the "IPDA") sent an e-mail to, among others, the heads of Kable, Curtis and TWR along with the 2009 budget. And on January 22, 2009, Mike Duloc of Kable sent an e-mail to Rich Jacobsen, president of Kable's competitor, TWR, to ask him if he was "available anytime today for a call," stating that he "would like to catch up on a few" purportedly "IPDA type items." And five days later, the same two competing CEOs scheduled a breakfast for Thursday, January 29, 2009.  On January 22, Duloc took steps to attempt to enlist Michael Sullivan, President and CEO of Comag, to join defendants' conspiracy.

63.   As a result of these inter-competitor communications, defendants and their co-conspirators were able to maintain their attack on Source's business by acting in concert to cut off Source's supply of magazines.

## 2.   The Goal of the Conspiracy

64.   The ultimate goal of the conspiracy was to ensure that the publishers gained control over the single-copy magazine distribution channel.  To achieve that goal, defendants and their co-conspirators needed to eliminate Source and Anderson, the two wholesalers who were attempting to address the publisher-imposed inefficiencies.  To eliminate Source, the conspirators cut off the life blood of Source's business -- 80% of its magazine supply.  One of the objectives of the conspiracy was to force Source to sell at a "fire sale" its business

infrastructure -- including its trucking fleet, distribution equipment and distribution centers -- to its wholesaler competitors, Hudson and News Group.

65.    The elimination of Source and Anderson would leave only two major wholesalers, Hudson and News Group, who would then be controlled by the publishers and their national distributors.  The national distributors thus would, on behalf of their collective clients, ensure that the increased costs of the publisher-imposed inefficiencies would be passed on to the retailers rather than the publishers, which is precisely what commenced to occur as soon as the Source and Anderson retailers were taken over by Hudson and News Group.  During Mays's planned February 2 dinner meeting in New York with Rich Jacobsen, Jacobsen confirmed this in no uncertain terms.  In a total and dramatic about-face from their meeting on Saturday, Jacobsen declared that there would be no conversation about supply because TWR would not be supplying any magazines to Source.  During dinner, Mays asserted to Jacobsen that with the distribution system being created by him and others, there would be no scan-based trading, the wholesalers would force reduced margins down to the retailers rather than to the publishers, and there would be absolute control over the market.  Jacobsen's response was:  "Exactly -- we now control this space."

66.    The defendants' scheme was a reaction to growing demands by retailers, who had been seeking larger discounts on magazines and implementation of scan-based trading ("SBT").  In response to these demands, the defendants and their co-conspirators conspired, in clear violation of antitrust laws, to do what they could so that Source and Anderson would be stifled and forced out of the market, and thus they could ensure that their co-conspirators, News Group and Hudson, could, as the only remaining significant wholesalers in the market, take margin from the retailers, and not from the conspiring publishers and national distributors.

19

67.    The defendants' scheme already has succeeded in enabling Bauer and its co-conspirators to charge retailers higher prices, and at the same time impose their will regarding scan-based trading.  Thus, the wholesaler have already begun to serve retailers previously served by Anderson, and, when signing agreements with those retailers, have negotiated higher rates for "[a]bout 80%" of the new business.  In one instance, for example, News Group was able to reduce the cover-price discounts received by retailer Kroger from 27% to 26% (in other words, Kroger now pays 74% of the magazine cover price, whereas previously it paid 73%), made possible solely by defendants' conspiracy.  This represents a 1.37% price increase -- 74% of the cover price minus 73% of the cover price, divided by the rate, 73% of the cover price, equals 1.37% -- for the exact same products Kroger was receiving through Anderson.  An e-mail, which Source has been told by a publisher is from a client of Curtis, describes that increase.  News Group was also able to reduce the cover-price discounts received by retailer Kroger on certain other magazine titles from 36% to 32%, which represents a 12.5% price increase.  News Group was able to decrease the cover-price discounts by retailer Hardings Market.  Source also understands that Hudson has already imposed price increases in Pennsylvania.

68.    Defendants and their co-conspirators clearly were acting in concert and not unilaterally.  Indeed, unilateral action would make no economic sense because, unless the other national distributors and publishers joined in the boycott, an individual publisher or distributor's magazines would not be distributed to retailers in the areas where Source was -- and still is -- the only viable wholesaler.  As Castardi himself has admitted, "it is common industry knowledge that in the Los Angeles market, Source accounts for approximately 90% of all newsstand deliveries of numerous publications.  Source is also known to be the dominant

wholesaler in Chicago, Philadelphia, and Washington, D.C." Unless the individual distributor

or publisher had agreed ahead of time with one or more of Hudson and News Group, as well as

with one or more of its fellow distributors or publishers, it could have no assurances that either

Hudson or News Group would have moved in to distribute magazines in areas served by

Source -- indeed, for Hudson or News Group to do so based on the opportunity to distribute

any single publisher's or distributor's product would be highly unprofitable.  In other words,

by unilaterally cutting off supply to Source, an individual distributor or publisher would be

cutting itself off from one of the largest markets in the United States, and seriously hampering

the distribution of its magazines in four other large markets around the nation.  Any such

unilateral action absolutely would be against the publisher's business interest -- unless, of

course, the publishers and their national distributors -- as clearly occurred here -- agreed in

advance and acted in concert -- to cut off supply to Source at the same time and to replace

Source with a mutually agreed-upon substitute wholesaler -- that is, one of wholesaler Hudson

and News Group.

## E.   **Source Will Suffer Irreparable Harm**

69.    Absent intervention by this Court permanently enjoining Bauer from acting in

concert to cut off the supply of their magazines to Source, the harm both to competition in this

market and to Source's distribution business, good will, reputation and customers, will be

irreparable.  Defendants' conduct already has caused enormous damage.  One of Source's

important customers, Supervalu, for example, immediately sent a letter to Source on February

2, 2009, referring to TWR's termination letter and advising that the loss of that business

"would result in material reduction of available popular titles by approximately fifty percent,"

that Supervalu was being placed in "an unacceptable position," and that, if Source is unable to

ship that product, "Supervalu will have no choice but to seek these titles elsewhere." Another important customer, Kroger, sent a letter to Source on February 5 stating that Kroger "has been informed that Source Interlink is currently unable to supply to Kroger" certain magazine titles and advising that Kroger is "seeking to obtain these titles from alternative sources." Kroger followed through on February 9, alerting publishers and distributors that magazines distributed by Curtis, Kable, and TWR to Kroger would now be wholesaled by News Group. Thus, within only a few days after the boycott began, a large proportion of customers had signed with News Group, Hudson, or other wholesalers to replace the products that they previously had received from Source or Anderson.

70.   Defendants' attack on Source is resulting in an anti-competitive monopoly in the magazine distribution business. In addition to Jacobsen's February 2 boast, the e-mail Source has been told is from a client of Curtis is just another admission that the destruction of Source and Anderson will create a "monopolistic wholesaler" with the power to dominate the market.

## THE RELEVANT MARKET

71.   The relevant product market for the purposes of this action is the national market for the wholesale distribution of single-issue magazines. The four major wholesale distributors of single issue magazines in the United States -- Source, Anderson, Hudson and News Group -- sell hundreds of magazine titles to thousands of retailers across the country. These wholesalers introduce great efficiencies into the market. By purchasing from wholesalers, retailers receive an enormous savings of time and expense by allowing them to purchase from a single source with an established distribution network.

72.    To obtain these savings, retailers obtain all of their product from the wholesale network, comprised of the four wholesale distributors, and do not deal directly with publishers or national distributors.  Because of the sheer number of publishers and their publications, it would be prohibitively expensive for retailers to obtain their magazines outside of the wholesale market, as it would require them to:  contact each individual publisher; negotiate prices for and order each individual publication; and physically transfer those magazines to their retail outlets -- that is, take over the functions performed by the wholesalers and national distributors.  Because of these costs, retailers are unable to substitute the magazines obtained through the wholesale network with magazines obtained from some other source.  As a result, retailers must continue to utilize the wholesale network even if the prices in that market rise.

73.    Because of the costs involved in developing and maintaining the distribution network necessary to transport millions of magazines to thousands of different retail outlets -- including distribution centers, freight depots, fleets of trucks, and thousands of employees -- the wholesale distribution market is characterized by high barriers to entry.  These entry barriers are reinforced through the exclusive distribution agreements involving wholesalers, national distributors and publishers.

## COMPETITION HAS BEEN
## INJURED BY THE CONSPIRACY

74.    Defendants' actions unduly restrain, hinder and suppress competition among wholesalers in the national market for the wholesale distribution of single-copy magazines.  Defendants, directly and proximately, have caused antitrust injury because, absent injunctive relief, their actions will ultimately result in the elimination of Source as a wholesale distributor, thereby directly and substantially reducing the output of magazines and directly and

23

substantially reducing the ability of retailers to obtain those magazines. Defendants' conduct also has allowed the co-conspirators, including Bauer, to force retailers to pay higher prices (in the form of reduced discounts) as already has been experienced with certain of the new agreements negotiated by Hudson and News Group. The purposeful and wrongful attempt to destroy Source's business by defendants directly has harmed both competition in the relevant market as well as Source.

75.   Defendants' conduct has reduced the output of magazines through the wholesale market. Source and Anderson, combined, distribute 50 percent of all U.S. single-copy magazines, and in many instances are the only wholesale distributors operating in a numerous geographic regions. Because of the co-conspirators' unlawful boycott, wholesale distributors were unavailable to serve retailers in those areas, and those retailers were denied access to the co-conspirators' magazines -- which meant, in turn, that the retailers' customers had access to fewer magazines as well.

76.   Moreover, absent permanent injunctive relief, Source will ultimately be forced to exit the market, and, in areas where Source has the only viable distribution operations, it will be weeks or months, if ever, before magazines can be delivered to retailers in those markets. Magazine publishers are paid based only on the number of magazines sold, not the number of magazines produced, which means that, unless magazines make it onto store shelves, publishers will not receive income on the magazines they publish. Many smaller publishers depend on regular nationwide distribution, and some may be unable to survive a disruption in sales of even a few weeks. Many are likely to be forced to shut down. This will permanently reduce the choices available to retailers and their customers, and correspondingly, benefit the

remaining large publishers in the marketplace -- including defendant Bauer, as well as AMI, Hachette and Rodale.

77.    The co-conspirators already have begun charging retailers higher prices for the same products, and, if defendants succeed in forcing Source to exit the market, the co-conspirators will continue to raise the prices paid by retailers.  For example, as a result of the co-conspirators' boycott, News Group has begun to distribute to retailers previously served by Anderson and Source.  As it has done so, it has been "re-signing" those retailers at a higher rate than what they paid Source or Anderson, forcing the retailers to pay a higher portion of each magazine's cover price.  News Group's ability to charge these higher prices is not the result of any inherent or earned competitive advantage, but instead has arisen solely as a result of the increased market power obtained by participating in the collusive boycott of Source and Anderson.

78.    Indeed, if defendants' conspiracy succeeds, News Group and Hudson stand to acquire monopolistic market power.  News Group and Hudson have already gained substantial market share due to the destruction of Anderson, and once defendants' conspiracy to destroy the wholesale business of Source succeeds, a very likely occurrence absent permanent injunctive relief, News Group and Hudson together will control more than 90% of the U.S. wholesale magazine distribution market and, more importantly, each will control more than 90% of the market in its allocated territories.  In light of defendants' anti-competitive conduct in obtaining this market power, there are substantial grounds to believe that the wholesalers' acquisition of market power will harm competition market-wide.

## FIRST CLAIM

### (Unlawful Restraint of Trade -- Sherman Act)

79.    Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as if fully set forth herein.

80.    Defendants have engaged in a conspiracy in unreasonable restraint of trade in violation of section 1 of the Sherman Act (15 U.S.C. § 1) and section 4 of the Clayton Act (15 U.S.C. § 15).

81.    Defendants engaged in a conspiracy to eliminate competition in the wholesale market for single-issue magazines through the wrongful destruction of competitors Source and Anderson as going concerns, and the defendants did those things that they combined and conspired to do, including the following:

(a)    agreed to boycott the distribution of single-issue magazines to wholesalers Source and Anderson with the intent of destroying them as competitors;

(b)    agreed to, and did in fact, disparage Source's business to its retail customers for the purpose of interfering with Source's business relationships and contractual agreements with those customers with the intent of forcing Source's customers to move their business to Hudson and News Group;

(c)    agreed to raid, and, in fact, did raid the employees of Source and Anderson for the purpose of stealing their trade secrets and eliminating them as competitors; and

(d)    agreed to destroy Source and Anderson as going concerns and to force those wholesalers to sell their distribution facilities and other assets -- at distressed prices -- to Hudson and its competitor News Group.

82.    The national distributors not only colluded among themselves, but also employed their anti-competitive agreements with their publisher-clients, to facilitate collusion among those publishers, including defendant Bauer, as well as Hachette, Rodale, AMI and Time.

83.   Defendants' conspiracy has the effect of restraining trade by suppressing and eliminating competition in the national market for the wholesale distribution of single-issue magazines.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs have suffered, and will continue to suffer, injury to their business.

84.   The continuation of defendants' unlawful conduct will have the ultimate effect of destroying plaintiffs' ability to continue as going concerns, and defendants' unlawful conduct will continue unless permanently enjoined by this Court.

85.   Plaintiffs have no adequate remedy at law.

## SECOND CLAIM

### (Defamation)

86.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as if fully set forth herein.

87.   Defendants, individually and in conspiracy with each other and their co-conspirators, have published false statements to third parties about Source's financial status and continued existence as a magazine wholesaler.

88.   Defendants and their co-conspirators have falsely and deceitfully, both orally and in writing, told third parties false statements regarding Source's financial status and continued existence as a magazine wholesaler.

89.   The false and defamatory statements made by the defendants and their co-conspirators are injurious to the business reputation of Source and will tend to prejudice it in the conduct of its trade or business and will deter third persons from dealing with it.

90.   The false and defamatory statements made by the defendants and their co-conspirators have caused damages to plaintiffs in that the false statements have caused damage to the reputation of Source in its trade and business activities.

### THIRD CLAIM

### (Tortious Interference)

91.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as if fully set forth herein.

92.   Source maintains significant business relationships with the retailer customers that are a part of its national retail distribution network.

93.   There exist valid, binding contracts between Source and members of its retail distribution network (the "Retail Supply and Retail Service Agreements").

94.   Defendants have at all times been aware of the business relationships between Source and its retailer customers.

95.   Defendants have at all times been aware of the conditions in the Retail Supply and Service Agreements.

96.   Defendants and their co-conspirators intentionally and unjustifiably have interfered with Source's business relationships and contractual agreements with Source's retailer customers by making false statements regarding Source's financial status and continued existence as a magazine wholesaler.

97.   Defendants also have intentionally and unjustifiably interfered with Source's business relationships and contractual agreements with Source's retailer customers by

boycotting the distribution of single-issue magazines to Source without a legitimate business justification with the intent of harming its business.

98.   Source has been injured by the defendants, because, among other things, many of its retailer customers are threatening the termination of their Retail Supply and Retail Service Agreements and their business relationships with Source, and seeking to obtain single-issue magazine product from alternative sources.

99.   Source's retailer customers have threatened to terminate both their Retail Supply and Retail Service Agreements and their business relationships with Source, and are seeking to obtain magazine product from alternative sources, principally Hudson and News Group, as a direct and proximate cause of defendants' conduct.

100.  Plaintiffs were damaged by defendants' wrongful conduct.

## FOURTH CLAIM

### (Civil Conspiracy)

101.  Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 78, 87 through 90 and 92 through 100, as if fully set forth herein.

102.  The defendants conspired with one another to harm Source's reputation, to undermine Source's goodwill with its customers, to damage its business, and to destroy Source as a going concern.

103.  Each of the defendants and their co-conspirators have committed one or more of the following acts:  boycotted the distribution of single-issue magazines to wholesaler Source with the intent of destroying it;  attempted to force Source to sell its business infrastructure --

29

including its trucking fleet, distribution equipment and distribution centers -- to its wholesale competitors at below market prices; disparaged Source's business to its retail customers for the purpose of interfering with its business relationships and contractual agreements with those customers with the intent of forcing Source's customers to move their business to Hudson and News Group; and raided Source's employees for the purpose of stealing its trade secrets and eliminating it as a competitor.

104.  Defendants undertook their wrongful, intentional and unjustifiable acts in furtherance of their ongoing conspiracy to destroy Source through, among other things, defamation and tortious interference.

105.  Plaintiffs were damaged as a result of the unlawful acts performed in furtherance of the conspiracy.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally, as follows:

(a)   Permanently enjoining defendants, their affiliates, successors, transferees, assignees, and the officers and directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner: (i)  boycotting the distribution of single-issue magazines to Source; (ii)  disparaging Source to its retail customers, publishers or any other persons; (iii)  interfering with Source's business relationships and contractual agreements with its retail customers;  and (iv)  stealing Source's employees, trade secrets or intellectual property;

(b)   Permanently enjoining defendants, their affiliates, successors, transferees, assignees, and the officers and directors, partners, agents and employees thereof, and all other

persons acting or claiming to act on their behalf, from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any plan, practice or device having a similar purpose or effect;

(c)     Permanently ordering that the publisher defendant Bauer shall desist from its illegal boycott of Source and shall supply to Source the magazines that were being supplied by Bauer before January 15, 2008 on the same terms and conditions applicable to Source before January 15, 2008 but in no event worse than those received by News Group and Hudson;

(d)     Declaring that the unlawful contract, combination and conspiracy alleged herein be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15. U.S.C. § 1;

(e)     On their First Claim, awarding plaintiffs treble their damages in an amount to be determined at trial;

(f)     On their Second, Third and Fourth Claims, awarding plaintiffs compensatory and punitive damages in amounts to be determined at trial;

(g)     Awarding plaintiffs their costs in the prosecution of this action, including reasonable attorneys' fees; and

(h)     Awarding plaintiffs such other and further relief as is just and proper.

## **TRIAL BY JURY**

Trial by jury is demanded on all issues so triable.

Dated: April 10, 2009

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP

By: _____

Marc E. Kasowitz (mkasowitz@kasowitz.com)
Daniel R. Benson (dbenson@kasowitz.com)
Hector Torres (htorres@kasowitz.com)
Maria Gorecki (mgorecki@kasowitz.com)

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

Attorneys for Source Interlink Distribution, L.L.C.
and Source Interlink Companies, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SOURCE INTERLINK DISTRIBUTION, L.L.C. and
SOURCE INTERLINK COMPLANIES, INC.,          :

                          :

                   Plaintiffs,          :          Index No. :09 CIV. 1152 (PAC)

        -against-          :

BAUER PUBLISHING CO., LP., MR CONSULTING:          AFFIDAVIT OF SERVICE
SERVICES LLC, and MICHAEL R. ROSCOE,
                        :

               Defendants.          :
-----------------------------------------------------------------X

STATE OF NEW YORK          )
                  ): ss.:
COUNTY OF NEW YORK          )

        Kanchana W. Leung, being duly sworn, deposes and says that she is employed by

**Kasowitz, Benson, Torres & Friedman LLP**, attorneys for plaintiffs, she is over the age of eighteen

years and is not a party to the within action.

        On the 10th **day of April, 2009**, deponent served a copy of the **Second Amended**

**Complain** on defendants by depositing same in an official depository under the exclusive care and

custody of the United States Postal Service within the State of New York, contained in a securely sealed

postpaid wrapper addressed to;

                  **BAUER PUBLISHING CO., LP**
                  STEPHEN G. RINEHART
                  TROUTMAN SANDERS
                  405 LEXINGTON AVENUE
                  NEW YORK, NY 10174-0700

these being the address designated by said attorneys for that purpose upon the preceding papers in this

action.

                                           Kanchana W. Leung

Sworn to before me this
10th day of April, 2009

          Notary Public

LANA RAFAEL
Notary Public, State of New York
No. 01RA6042271
Qualified in Kings County
Commission Expires May 22, 20__